State of CONNECTICUT, Plaintiff,

v.

William M. DALEY, Secretary of Commerce of the United States, Defendant.

Nos. Civ.A3:97CV2726(CFD), 3:98 CV 173(CFD).

United States District Court, D. Connecticut.

May 4, 1999.

---

Kimberly P. Massicotte, David H. Wrinn, Brian J. Comerford, Attorney General's Office, Hartford, Connecticut, for plaintiff.

Mark A. Brown & Warigia Bowman, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, D.C., for defendant.

State of New Jersey, Barbara Conklin, Trenton, New Jersey, State of Rhode Island, Gary Powers, State of Rhode Island, Department of Environmental Management, Providence, Rhode Island, amicus curiae parties.

## RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

The plaintiff, State of Connecticut ("Connecticut"), and the defendant, William M. Daley, Secretary of Commerce of the United States ("Secretary"), have filed motions for summary judgment in these consolidated actions.[1] Upon consideration of the parties' written and oral arguments

---

1. The State of New Jersey and the State of Rhode Island were each granted permission to participate as amicus curiae.

and review of the administrative record filed in these cases, Connecticut's motion for summary judgment [Doc. # 15 and # 26] is DENIED with respect to both actions and the Secretary's cross-motion for summary judgment [Doc. # 28] is GRANTED with respect to both actions for the reasons set forth below.

## I. INTRODUCTION

These lawsuits concern commercial fishing of summer flounder (*Paralichthys dentatus* ). The summer flounder, also known as fluke, is native to the Atlantic Ocean and has a geographical range that extends from Nova Scotia to Florida. The highest concentration of summer flounder is found between Cape Cod, Massachusetts and Cape Fear, North Carolina. Depending on the season, summer flounder can be found from the outer portion of the continental shelf to shallow coastal waters. Atlantic States Marine Fisheries Comm'n, Fishery Management Report No. 23, Amendment 2 to the Summer Flounder Fishery Management Plan 12 (March 1993). Over the course of many years, a combination of factors, including over-fishing, has depleted the summer flounder stock. The decreased availability of summer flounder and the efforts to conserve and restore the summer flounder stock has increased pressure on the commercial fishing industry and led to a number of disputes, including this one, over fishing rights. *See, e.g., Fishermen's Dock Co-op., Inc. v. Brown,* 867 F.Supp. 385 (E.D.Va. 1994), *rev'd,* 75 F.3d 164 (4th Cir.1996); *North Carolina Fisheries Ass'n, Inc. v. Daley,* 27 F.Supp.2d 650 (E.D.Va.1998).

Both of the cases filed by Connecticut petition the court to review separate final actions taken by the Secretary concerning the Fishery Management Plan (FMP) for summer flounder. The FMP for summer flounder was developed, at the direction of Congress, by the Mid–Atlantic Fishery Management Council[2] ("MAFMC" or "Council") and the Atlantic States Marine Fisheries Commission[3] ("ASMFC" or

2. The MAFMC was established in 1976 along with seven other regional fishery management councils. The regional councils were given the responsibility of drafting a FMP for each fishery within their respective jurisdictions in need of a management and conservation framework, 16 U.S.C. § 1853, and then submitting the FMP and any subsequent amendments to the Secretary for approval. 16 U.S.C. § 1854. The MAFMC is made up of representatives from New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia and North Carolina. 16 U.S.C. § 1852(a)(1)(B) (1996). The MAFMC has twenty-one voting members, including the principal state official with marine fishery management responsibility and expertise in each constituent state, thirteen individuals (at least one from each constituent state) who are knowledgeable regarding fishery conservation and management issues or the harvest taken from the fisheries in the geographical area, and the Regional Director of the National Marine Fisheries Service (NMFS). *See* 16 U.S.C. § 1852(b). The MAFMC has jurisdiction over the FMP for summer flounder because the Secretary, pursuant to 16 U.S.C. § 1854(f)(1)(A), designated the MAFMC as the controlling council over the summer flounder fishery, which also extends across the jurisdictions of the New England Fishery

Management Council ("NEFMC") and the South Atlantic Fishery Management Council. Connecticut has not challenged the decision of the Secretary to designate authority over the summer flounder fishery to the MAFMC instead of requiring that the FMP and amendments to the FMP be prepared jointly by the MAFMC and the NEFMC, the Council where Connecticut is a voting member. *See* 16 U.S.C. § 1854(f)(1)(B).

3. The Atlantic States Marine Fisheries Commission was established by an interstate compact consented to and approved by Congress in Public Laws 77–539 and 81–721. *See* 16 U.S.C. § 5102(3). The Commission is made up of representatives from the coastal states between Maine and Florida. The Commission oversees and manages Atlantic coastal fisheries and is charged with the responsibility to prepare and adopt coastal fishery management plans to provide for the conservation of coastal fishery resources. 16 U.S.C. § 5104(a)(1). When addressing a fishery which extends among the coastal waters of several states and the federal exclusive economic zone, the Commission is to consult with the appropriate Councils to develop coastal management plans that complement any FMP the Councils have adopted. 16 U.S.C. § 5104(a)(1). The Commission also

"Commission") and is intended to allow for a maximum number of summer flounder to be caught while also providing a conservation framework for the summer flounder stock to be replenished.[4] The Secretary[5] approved the FMP and adopted regulations implementing the FMP in 1988. *See* 50 C.F.R. §§ 648.100–648.106. Since 1988, the Secretary has also approved several amendments to the FMP proposed by the Council and Commission and has adopted regulations that have implemented the amendments. Two amendments in particular are at issue in these cases: Amendment 10, which was adopted by the Council and Commission and approved by the Secretary; and proposed Amendment 11, which was not adopted or sent to the Secretary for approval.

The first action of the Secretary challenged by Connecticut is his decision not to issue regulations implementing an alternative quota system that was considered, but not recommended, by the Council and Commission when they prepared Amendment 10 to the FMP in 1997. The Council and Commission had discussed replacing the current state-by-state quota system[6]

with various coast wide quota alternatives when they were drafting Amendment 10. The Council and Commission, however, ultimately decided to retain the state-by-state system and did not include in Amendment 10 any recommendation for the Secretary to institute a coast wide quota system. The Secretary, following the requisite notice and comment period, issued regulations on December 3, 1997, that adopted most of the recommendations of the Council and Commission contained in Amendment 10. *See* Amendment 10 to the Summer Flounder FMP, 62 Fed.Reg. 63,872–63,876 (1997) (to be codified at 50 C.F.R. pt. 648).[7] The Secretary did not issue any new regulations concerning the quota system for summer flounder. Connecticut then filed its first petition for review on December 31, 1997, challenging the Secretary's failure to change the quota system. The case was assigned to this court with the docket number 3:97 CV 2726.

The second action taken by the Secretary that Connecticut challenges is his denial of Connecticut's petition for rule mak-

---

monitors each state to ensure that it is following the coastal fishery management plan. 16 U.S.C. § 5104(c).

**4.** The FMP and any amendments to the FMP are jointly prepared by the Council and the Commission pursuant to the Magnuson–Stevens Fishery Conservation and Management Act of 1976, as amended, 16 U.S.C. § 1801 *et seq.*, the Atlantic Coast Fisheries Cooperative Management Act, 16 U.S.C. §§ 5101–5108, and the regulations promulgated by the Secretary, 50 C.F.R. § 648.100 *et seq.* The Secretary also has the power in certain limited circumstances to create and amend an FMP on his own. *See* 16 U.S.C. § 1854(c). The FMP, amendments to the FMP, and any regulations implementing the FMP are required to be consistent with ten "National Standards" for fishery conservation and management. *See* 16 U.S.C. § 1851(a). The court will discuss the National Standards in detail later in this ruling. *See, infra,* III.C.3.

**5.** Throughout this ruling, William M. Daley's predecessors as the Secretary of Commerce will also be referred to as Secretary.

**6.** The states included in the state-by-state quota system for the summer flounder fishery are Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia and North Carolina. *See* 50 C.F.R. § 648.100(d) (establishing the percentages of the quota allocated to each state).

**7.** The regulations adopted by the Secretary (1) modified the commercial minimum net size; (2) continued a moratorium on entry of additional commercial vessels; (3) removed the landing requirements applicable to permit retention; (4) modified the vessel replacement criteria; (5) allowed charter/party boats to possess fillets less than the predetermined minimum size if the state of the charter/party boat issued such a permit to the boat; and (6) prohibited boat-to-boat transfer of summer flounder at sea. The Secretary did not adopt the provision in Amendment 10 which recommended granting *de minimis* status to states harvesting less than 0.1 percent of the annual commercial quota. Amendment 10 to the Summer Flounder FMP, 62 Fed.Reg. at 63,-873.

ing. In April 1997, Connecticut filed a petition for rule making that asked the Secretary to replace the current state-by-state quota system pursuant to his authority under 5 U.S.C. § 553. *See* 16 U.S.C. § 1855(d) ("The Secretary may promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter."). Connecticut requested that the Secretary institute a coast wide quota system to replace the state-by-state quota system. Connecticut's petition for rule making proposed two alternatives, either: (1) a system which contained three unequal periods with a coast wide quota during the winter periods (January–April and November–December) and a state-by-state quota in the summer period (May–October), which was Connecticut's preferred option; or (2) a system divided into three coast wide quota periods (January–April, May–October, November–December) with a corresponding system of coast wide landing limits.

Connecticut also proposed that any state-by-state quota system enforced by the Secretary be based on landings data collected from the years 1990 through 1992, rather than the current data taken from the years 1980 through 1989. Connecticut argued that the existing method of calculating each state's quota percentage was unfair because it failed to account for the fact that many of the northern states along the summer flounder fishery, including Connecticut, had instituted larger minimum size requirements for fish to be landed in those states' ports during the 1980 through 1989 time period. Connecticut believes this caused a lower number of fish to be landed in Connecticut ports during the base period. Connecticut's petition argued that the northern states are unfairly penalized with small quota percentages for their early efforts at conservation in the 1980s, while the southern states' larger quota percentages are the result of their smaller minimum size requirements in effect from 1980 through 1989. These smaller minimum size requirements, Connecticut argues, enabled the southern fishermen to land smaller fish, and thus more fish, during the base period, which increased their allotment under the state-by-state quota system.

The Secretary published notice of Connecticut's petition for rule making in the Federal Register, inviting public comment. Petition for Rulemaking for Redistribution of the Summer Flounder Quota, 62 Fed. Reg. 29,694–29,695 (1997). During the comment period, the Secretary received letters in support of Connecticut's petition from the Commonwealth of Massachusetts, the State of New Hampshire, the State of Connecticut, a co-signed letter from Connecticut Senators Christopher Dodd and Joseph Lieberman and Connecticut Representative Sam Gejdenson, a letter from the Southern New England Fishermen's and Lobstermen's Association, Inc., and several form letters and postcards from interested fishermen. No comments in opposition to Connecticut's petition were apparently filed.

While Connecticut's petition for rule making was under consideration by the Secretary, the Council and Commission were preparing Amendment 10 which, as stated above, was approved by the Secretary on December 3, 1997. During the same time period, the Commission, through its Summer Flounder Technical Committee ("Technical Committee"), was also considering Amendment 11. Amendment 11 proposed a change in how the state-by state quota percentages were calculated to account for the difference in size limits set by each state for summer flounder caught during the period from 1980 through 1989. The alternative calculation methods proposed by the Committee were then considered by the Commission's Summer Flounder Management Board at its annual meeting held October 19–23, 1997. The Management Board, after discussing the issue at some length, declined to recommend the Committee's proposals to the

full Commission for an endorsement to the Secretary. The Secretary, therefore, was never formally presented with Amendment 11 for his consideration in adopting new rules and regulations for the summer flounder FMP.

Following the adoption of Amendment 10 and the Management Board's vote not to recommend Amendment 11, the Secretary also denied Connecticut's petition for rule making. Decision on Petition for Rulemaking for Redistribution of the Summer Flounder Quota, 63 Fed.Reg. 2,651–2,654 (Dep't Commerce 1998). Connecticut filed its second petition for review on January 29, 1998, challenging the Secretary's decision to deny Connecticut's petition for rule making. The second case was assigned to Chief District Judge Alfred V. Covello and given the docket number 3:98 CV 173. The second action was transferred to this court on October 19, 1998, and consolidated with the first action. The court also granted Connecticut's motion for expedited review, filed on September 28, 1998, and set an accelerated briefing schedule for the parties' cross-motions for summary judgment in both of the consolidated actions.

## A. Connecticut's Motion for Summary Judgment

In its motion for summary judgment, Connecticut's principal argument is that the Secretary failed to adequately consider Connecticut's petition for rule making and, instead, deferred to the decisions by the Council and Commission to maintain the state-by-state quota system and the Commission's decision to maintain the method of calculating the quota percentages allotted to each state. Connecticut maintains that the Secretary's deference to the Council and Commission was in derogation of his duties under 16 U.S.C. § 1854 and that the administrative record of the petition for rule making does not provide adequate factual support for the Secretary's decision to deny the petition. Connecticut also argues that changed circumstances

mandate an investigation by the Secretary into the state-by-state quota system and that the Secretary gave no reasoned response to Connecticut's assertions that the present quota system violates National Standards One, Four, Five, Seven and Ten. According to Connecticut, these actions by the Secretary should be set aside by this court because they are arbitrary and capricious, an abuse of discretion, not in accordance with the law, and short of the statutory rights afforded Connecticut under the Magnuson–Stevens Fishery Management and Conservation Act, 16 U.S.C. § 1801 *et seq.* ("Magnuson–Stevens Act").

## B. The Secretary's Cross–Motion for Summary Judgment

The Secretary's cross-motion for summary judgment puts forth two main arguments. The first is that this court lacks jurisdiction to hear the claims challenging the Secretary's decision to adopt regulations implementing Amendment 10. The focus of this argument is that Amendment 10 proposed by the Council and Commission did not recommend that the state-by-state quota system be revised and, therefore, under his statutory authority, the Secretary was powerless to adopt regulations changing the quota system when he considered Amendment 10. The Secretary also asserts that Connecticut's challenge to Amendment 10 is really a challenge to the quota system established by Amendment 2 to the FMP in 1992. Such a challenge, the Secretary maintains, is time barred by the 30–day provision for appealing any final action of the Secretary. 16 U.S.C. § 1855(f). Finally, the Secretary asserts that Connecticut failed to comment on Amendment 10 during the comment period and that, by failing to comment, Connecticut did not exhaust its administrative remedies.

The second principal argument put forth by the Secretary is that his decision to deny Connecticut's petition for rule making was reasonably made. As part of this

argument, the Secretary asserts that the National Standards are not applicable to the court's review of his decision to deny Connecticut's petition for rule making and that the administrative record adequately supports his decision to deny Connecticut's petition. The Secretary also argues, alternatively, that his decision to deny Connecticut's petition for rule making complies with the National Standards. Finally, the Secretary concludes that, should Connecticut prevail, the court only has the authority to remand Connecticut's petition to the Secretary for further consideration and is not authorized to grant Connecticut's requested injunctive relief of forcing a decision from the Secretary within thirty days.

## II. STANDARD OF REVIEW

Final actions taken by the Secretary under the Magnuson–Stevens Act are subject to judicial review if the petition for review is filed within thirty days after the date on which the final action was taken. 16 U.S.C. § 1855(f)(1); *Norbird Fisheries, Inc. v. NMFS*, 112 F.3d 414, 416 (9th Cir.1997). If a petition for review is timely filed, the Secretary's actions are subject to a limited judicial review. 16 U.S.C. § 1855(f)(1)(A)(B); *see Fishermen's Dock Co–op., Inc. v. Brown*, 75 F.3d 164, 167–68 (4th Cir.1996); *Parravano v. Babbitt*, 837 F.Supp. 1034, 1041–42 (N.D.Cal.1993). The Secretary does not contest that Connecticut's lawsuits were filed within thirty days of final actions taken by the Secretary.[8]

The Magnuson–Stevens Act provides that a court may set aside a regulation or an action taken by the Secretary if it violates the standards set forth in 5 U.S.C. § 706(2)(A), (B), (C), or (D) of the Administrative Procedure Act ("APA"). *See* 16 U.S.C. § 1855(f)(1)(B) (incorporating certain provisions of the APA). The Magnuson–Stevens Act, however, expressly forbids a reviewing court from postponing the effective date of the Secretary's action while it conducts its review. *Kramer v. Mosbacher*, 878 F.2d 134, 137 (4th Cir. 1989) (reviewing court prohibited from issuing injunction enjoining implementation of regulations); 16 U.S.C. § 1855(f)(1)(A) (specifically excluding the applicability of 5 U.S.C. § 705, which allows reviewing courts to grant injunctive relief pending review).

The APA provides that a reviewing court shall compel agency action unlawfully withheld or unreasonably delayed and set aside agency action, findings, and conclusions found to be (1) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law, (2) contrary to constitutional right, power, privilege, or immunity, (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or (4) promulgated without observance of procedure required by law. 5 U.S.C. § 706(1)(2); 16 U.S.C. § 1855(f)(1); *see J.H. Miles & Co., Inc. v. Brown*, 910 F.Supp. 1138, 1145–46 (E.D.Va.1995).

■ The Supreme Court has stated that courts reviewing agency actions "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). A reviewing court, therefore, should generally accord great deference to agency decisions. *J.H. Miles & Co., Inc.*, 910 F.Supp. at 1146; *see also Natural Resources Defense Council, Inc. v. S.E.C.*, 606 F.2d 1031, 1049 (D.C.Cir.1979) (reviewing court should conduct a searching

---

**8.** The Secretary does, however, challenge whether the regulations implementing Amendment 10 can be considered a final action with respect to the quota system for summer flounder. *See* discussion *infra*, III.B.

and careful review that is "in the last analysis, diffident and deferential").

■ With respect to a court's review of a specific regulation adopted by an agency pursuant to its delegated authority,

[the] regulation will be found to be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Southeastern Fisheries Ass'n, Inc. v. Mosbacher,* 773 F.Supp. 435, 439 (D.D.C.1991) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)); *see also Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 109 (1st Cir.1997).

■ When the agency action under review is the denial of a petition for rule making, the agency's decision must be sustained

if it violates no law, is blessed with an articulated justification that makes a 'rational connection between the facts found and the choice made' and follows upon a 'hard look' by the agency at the relevant issues.... The agency's determination is essentially a legislative one, and the reviewing court should do no more than assure itself that the agency acted "in a manner calculated to negate the dangers of arbitrariness and irrationality...."

*WWHT, Inc. v. F.C.C.,* 656 F.2d 807, 817 (D.C.Cir.1981) (citations and quotation marks omitted). Review under the arbitrary and capricious standard encompasses various levels of deference to the agency depending on the context of the agency's action and "an agency's refusal to institute rule making proceedings is at the high end of the range." *American Horse Protec-*

*tion Assoc., Inc. v. Lyng,* 812 F.2d 1, 4–5 (D.C.Cir.1987). A refusal to institute rule making should be overturned " 'only in the rarest and most compelling of circumstances' ... which have primarily involved 'plain errors of law, suggesting that the agency has been blind to the source of its delegated power.' " *Id.* at 5 (citations omitted).

■ In the context of the Magnuson–Stevens Act, courts reviewing the Secretary's actions have recognized that "the Secretary has broad discretion in promulgating regulations to implement the [FMP] and the court may only consider 'whether this discretion was exercised rationally and consistently with the standards set by Congress....' " *Southeastern Fisheries Ass'n, Inc.,* 773 F.Supp. 435, 439 (D.D.C. 1991) (quoting *Louisiana v. Baldridge,* 538 F.Supp. 625, 628 (E.D.La.1982)). *See also Associated Fisheries of Maine, Inc.,* 127 F.3d at 109; *Washington Crab Producers, Inc. v. Mosbacher,* 924 F.2d 1438, 1441 (9th Cir.1990); *Alaska Factory Trawler Ass'n v. Baldridge,* 831 F.2d 1456, 1460 (9th Cir. 1987); *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977); *J.H. Miles & Co., Inc.,* 910 F.Supp. at 1146. The Secretary's actions are presumed valid and the court must not substitute its judgment for that of the Secretary. *Maine v. Kreps,* 563 F.2d at 1055; *J.H. Miles & Co., Inc.,* 910 F.Supp. at 1146 (citing *Washington Crab Producers, Inc.,* 924 F.2d at 1441; *National Fisheries Institute, Inc. v. Mosbacher,* 732 F.Supp. 210, 219 (D.D.C.1990)). The Secretary's determination of what fishery conservation and management measures would be in the nation's best interest is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *National Fisheries Institute, Inc.,* 732 F.Supp. at 223 (quoting *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). Accordingly, it is

especially appropriate for the court to defer to the expertise of those individuals and entities—the Secretary, the

Councils, and their advisors—whom the [Magnuson–Stevens] Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.

*National Fisheries Institute, Inc.,* 732 F.Supp. at 223–24 (citing *Pittston Coal Group v. Sebben,* 488 U.S. 105, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988), and *Oregon Natural Resources Council,* 490 U.S. at 377, 109 S.Ct. 1851).

 The question for a court, then, is not whether it agrees with the decision of the Secretary; "the question is whether the decision made by the [Secretary] finds support in the administrative record." *C & W Fish Co. v. Fox,* 745 F.Supp. 6, 8 (D.D.C.1990), *aff'd,* 931 F.2d 1556 (D.C.Cir. 1991); *cf. Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n,* 582 F.2d 166, 172 (2d Cir.1978) ("What is required is that there be 'warrant in the record' and 'a reasonable basis in law' for the agency's determination...."). For a court to set aside the Secretary's action, it "must find that the administrative record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious." *J.H. Miles & Co., Inc.,* 910 F.Supp. at 1146; *see also Organized Fishermen of Florida, Inc. v. Franklin,* 846 F.Supp. 1569, 1573 (S.D.Fla.1994).

 Based on the foregoing standards, the court undertakes a narrow yet careful and searching review of the administrative record to determine whether the Secretary's actions are adequately supported by the available facts. The court conducts this review with due deference to the Secretary's expertise in making fishery conservation and management policy decisions and will only set aside the Secretary's actions if the administrative record indicates he has acted in derogation of his Congressionally delegated authority. The court will not substitute its own judgment for that of the Secretary. Finally, in conducting this review, the court looks to the National Standards for Fishery Conservation Management, established by Congress and set forth at 16 U.S.C. § 1851(a), as a guide for determining whether the Secretary exercised his authority rationally and consistently within the parameters set by Congress.[9]

## III. DISCUSSION

The motions for summary judgment filed by Connecticut and the Secretary are addressed to both of Connecticut's lawsuits. The court will address the parties' arguments with respect to each lawsuit separately, mindful of the applicable standard of review.

### A. The Administrative Record

The administrative record considered by the court was filed on three dates. The

---

9. The Secretary argues that the National Standards are not applicable to the court's review of his decision to deny Connecticut's petition for rule making because the National Standards only apply to a FMP or a regulation implementing a FMP. 16 U.S.C. § 1851(a). The court determines that the National Standards are applicable to its review. Even though the Secretary denied Connecticut's petition for rule making, the court still must review the Secretary's decision. *See General Motors Corp. v. National Highway Traffic Safety Administration,* 898 F.2d 165, 169 (D.C.Cir.1990) ("The Secretary's refusal to institute rule making is considered a final agency action subject to judicial review."). As part of its review, the court must determine whether the Secretary acted within the scope of his authority delegated by Congress. *See American Horse Protection Assoc., Inc.,* 812 F.2d at 5. If the Secretary had approved Connecticut's petition for rule making, he would need to amend the summer flounder FMP and promulgate regulations to enforce the amendment. The National Standards would apply to such action. *See* 16 U.S.C. § 1851(a). Similarly, the Secretary's denial of Connecticut's petition for rule making is reviewable to see if the state-by-state quota system he decided to maintain is in accordance with the Magnuson–Stevens Act and the National Standards. *See Southeastern Fisheries Ass'n, Inc.,* 773 F.Supp. 435, 439–40 (D.D.C.1991) ("[When] making ... a determination regarding FMP regulations, the Court must look to the National Standards....").

first submission of the administrative record (hereinafter referred to as "Record A10"), totaling 663 pages, consists of materials pertaining to the final rule implementing Amendment 10. It includes the final version of Amendment 10 that was approved by the Council and Commission on May 13, 1997. It also includes transcripts and summaries of Council meetings and public hearings, correspondence, and other materials related to Amendment 10. The second submission of the administrative record (hereinafter referred to as "Record Pet."), totaling 133 pages, consists of materials pertaining to the Secretary's decision on Connecticut's petition for rule making. It includes public comments received following the publishing of Connecticut's petition for rule making in the Federal Register, drafts of the Secretary's decision, and internal correspondence from the NMFS.

The third portion of the administrative record (hereinafter referred to as "Record A11"), submitted in the form of Exhibits (a)–(f), was filed after the hearing on the parties' cross motions for summary judgment. It contains information related to Amendment 11, including the minutes from the Summer Flounder Management Board meeting where the vote not to recommend Amendment 11 to the full Commission was taken. Attached to the third submission of the administrative record is a sworn declaration from the Chief of the Sustainable Fisheries Division of the NMFS, who was also the custodian of the entire administrative record filed in these cases. The declaration states that all of the information contained in the first, second, and third submissions of the adminis-

trative record were considered by the Secretary in making his decision on Connecticut's petition for rule making. Based on the declaration, the court will consider all of the information contained in the three submissions of the administrative record.[10]

### B. The 97 CV 2726 Action

The first lawsuit filed by Connecticut seeks judicial review of the Secretary's decision to promulgate regulations implementing Amendment 10 to the FMP for summer flounder. The regulations, as previously noted, were published at 62 Fed.Reg. 63,872–63,876. The complaint alleges that the fisheries quota for summer flounder, "established under the challenged regulations" implementing Amendment 10, severely restricts landings of summer flounder in Connecticut. Connecticut maintains that such a restriction violates National Standard Four of the Magnuson–Stevens Act.[11] As a result, Connecticut claims that the FMP is arbitrary and capricious, constitutes an abuse of discretion, and is otherwise not in accordance with the law.

Initially, the Court notes that Connecticut has indicated that it filed its first lawsuit to preserve substantive and procedural rights to challenge an adverse decision from the Secretary on Connecticut's then pending petition for rule making. Connecticut apparently did not wish to be precluded from seeking judicial review of the Secretary's ruling on Connecticut's petition because Connecticut had failed to challenge the Secretary's consideration of

10. Connecticut argues that the late filing of the third portion of the administrative record contradicts the position taken by the Secretary in his papers that the administrative record for Amendment 11 was never presented to him prior to this litigation. *See* Resp. of Connecticut to Def.'s Notice of Filing of Supp. to Admin.R. [Doc. # 43] at 1–3. The sworn declaration of the record custodian, however, states that the documents contained in the third filing of the administrative record were

inadvertently omitted from the previous two submissions of the record, and that all three portions of the record, taken together, comprise the complete administrative record for the Secretary's decision on Connecticut's petition for rule making. The court accepts the representation of the record custodian.

11. *See, infra,* III.C.3.ii. (discussing National Standard Four).

Amendment 10.[12] Connecticut now takes the position that the first lawsuit is no longer relevant, provided that its ability to prosecute the second lawsuit is unhindered. Conn.Mem. of Law in Opp'n to U.S. Mot. for Summ.J. [Doc. # 36] at 17.

The court finds that the first lawsuit is distinct from the second lawsuit and that Connecticut's ability to proceed with the second lawsuit is not contingent upon Connecticut's filing of the first lawsuit. *Cf. Midwater Trawlers Cooperative v. Mosbacher*, 727 F.Supp. 12, 16 (D.D.C.1989) (dismissing plaintiff's challenge to a FMP as time-barred but stating that plaintiff may petition the Secretary formally for an amendment to the FMP which, if denied, can be separately reviewed by the court). In addition, after reviewing the administrative record and the relevant provisions of the Magnuson–Stevens Act, the court finds that Connecticut's first lawsuit is procedurally flawed and that the challenged action of the Secretary was not arbitrary or capricious, or an abuse of discretion, and was otherwise in accordance with the law.

■■■ The principal reason Connecticut's first lawsuit fails is that the Secretary was never presented with a proposal in Amendment 10 that recommended changing the FMP to institute a coast wide quota system. *Midwater Trawlers Cooperative*, 727 F.Supp. at 16 ("[T]he Secretary ordinarily will not consider amending a[FMP] unless the council so recommends ...."). Amendment 10 only stated that alternatives to the state-by-state quota system had been discussed, but that the Council and Commission had decided to retain the current state-by-state quota system. The authority of the Secretary to promulgate regulations when presented with an amendment to a FMP by the Council or Commission is limited to that which has been presented to him. 16 U.S.C. § 1854(a)(b); *Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 57 (1st Cir.1993) ("If a council generates [an amendment to a FMP], the Secretary must follow a detailed procedure for review, as specified in § 1854(a), (b).").

The Secretary may only approve, disapprove, or partially approve of a FMP or amendment to a FMP proposed by the Council or Commission. 16 U.S.C. § 1854(a)(3). With respect to proposed regulations submitted along with an amendment, the Secretary may only determine if the regulations are consistent or inconsistent with the FMP, the amendment to the FMP, the Magnuson–Stevens Act, and other applicable law. 16 U.S.C. § 1854(b)(1). If the Secretary finds the proposed regulations consistent with the FMP, he must publish the regulations in the Federal Register to solicit public comment before issuing a final regulation. 16 U.S.C. § 1854(b)(1)(A). On the other hand, if the Secretary finds the proposed regulations inconsistent with the FMP, he must send them back to the council, who may then revise and resubmit them for reevaluation by the Secretary. 16 U.S.C. §§ 1854(b)(1)(B), 1854(b)(2). The Magnuson–Stevens Act is clear that when the Secretary is presented with proposed amendments and regulations, he does not have the independent authority to, *sua sponte*, add a regulation that is inconsistent with the proposal from the Council

12. Connecticut's concern was that Amendment 10 considered, without recommending, the same alternatives to the state-by-state quota system that Connecticut proposed in its petition for rule making. Connecticut's first lawsuit was apparently prompted by a letter it received, dated December 29, 1997, from the Northeast Regional Counsel of the National Oceanic and Atmospheric Administration. The letter stated that Amendment 10 had considered alternatives to the state-by-state quota system and that, if Connecticut wanted to seek judicial review of the Secretary's regulations implementing Amendment 10, an appeal needed to be filed within thirty days of December 3, 1997. The letter also stated that the Secretary's action concerning Amendment 10 had "bearing" on Connecticut's petition for rule making. *See* Conn.Mem. of Law. in Opp'n to U.S. Mot. for Summ.J. [Doc. # 36] at 16–17 & Attach. 5

and Commission. 16 U.S.C. § 1854(a)(b); *Midwater Trawlers Cooperative*, 727 F.Supp. at 16 ("[The Secretary] does not address the [FMP] unless the council recommends an amendment or a party formally requests an amendment."). For the Secretary to adopt a regulation implementing the coast wide quota system discussed in Amendment 10, he could only do so pursuant to his independent regulating authority and in accordance with the required procedures established for such action. *See* 16 U.S.C. § 1854(c) (setting forth Secretary's authority to prepare a FMP, propose amendments to a FMP, and establish regulations implementing a FMP) and 16 U.S.C. § 1855(d) (incorporating general rule making authority of APA, 5 U.S.C. § 553).

Connecticut's first lawsuit also fails because the Secretary does not have the power to amend the FMP or establish regulations to install a coast wide quota system on his own pursuant to his independent authority under 16 U.S.C. § 1854(c).[13] The Magnuson–Stevens Act expressly states that the authority to establish limited access quota systems is vested solely with the Council.[14] 16 U.S.C. § 1854(c)(3) ("[T]he Secretary may not include in any [FMP], or any amendment to any such [FMP], prepared by him, a provision establishing a limited access system, ... unless such system is first approved by a majority of the voting members, present and voting, of each appropriate Coun-

cil.").[15] Since the Council and Commission had already considered and rejected a proposal to establish an alternative coast wide quota system in Amendment 10, and since the Secretary did not have the independent authority to establish a coast wide quota system without the approval of the Council, the decision of the Secretary to promulgate regulations implementing Amendment 10 without including any changes to the summer flounder quota system was not arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law.

█ Finally, Connecticut's first lawsuit fails because the specific regulations adopted by the Secretary and challenged by Connecticut did not establish or alter the quota system for the summer flounder fishery. *See, supra*, n. 7. The state-by-state quota system that Connecticut opposes was established by Amendment 2 to the FMP, which was adopted by the Secretary in 1992, and which has been in effect since 1993. *See* Mid–Atlantic Fishery Management Council & Atlantic States Marine Fisheries Comm'n, Amendment 10 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan 6 (1997) (summarizing history of amendments to the FMP).[16] The state-by-state quota system was later adjusted by Amendment 4, which revised the state specific quota shares set forth in 50 C.F.R. § 648.100(d). *See* Record A10 at 338. No changes, however, have been made to the state-by-state

---

**13.** The other avenue of independent authority for the Secretary to issue regulations under the Magnuson–Stevens Act, 18 U.S.C. § 1855(d), was already being pursued by Connecticut through its then pending petition for rule making, which asked the Secretary to issue regulations under his general rule making authority from the APA. *See* 5 U.S.C. § 553 (incorporated by reference into 18 U.S.C. § 1855(d)). The Secretary's denial of Connecticut's petition for rule making is the subject of Connecticut's second lawsuit and is discussed, *infra*, at III.C.

**14.** *See, infra*, III.C.1. discussing the lack of authority for the Secretary to implement a limited access system for the summer flounder fishery on his own.

**15.** The term "limited access system" is not expressly defined by the Magnuson–Stevens Act, *see* 18 U.S.C. § 1802, or the Regulations, *see* 50 C.F.R. § 600.10, § 648.2, but the inherent function of a quota system is to limit the access of fishermen to the summer flounder fishery once the catch limit has been reached. Therefore, by definition, a quota is a type of limited access system.

**16.** The complete text of Amendment 10 and the attached appendices are included in the administrative record. *See* Record A10 at 334–569.

quota system since Amendment 4 was adopted by the Secretary in 1993.

Connecticut's first lawsuit erroneously alleges that the fisheries quota for summer flounder was established under the regulations incorporating the Amendment 10 proposals. The administrative record is clear that the regulations adopted by the Secretary on December 3, 1997, did not change the state-by-state quota system. As a result, there was no agency action concerning the quota system that is capable of being challenged by Connecticut in its first lawsuit. The last action taken by the Secretary concerning the summer flounder quota system occurred in 1993. Therefore, Connecticut's appeal to this court for review of the summer flounder quota system contained in the FMP is time-barred by the thirty-day statute of limitations set forth in 16 U.S.C. § 1855(f). *See Norbird Fisheries, Inc.*, 112 F.3d at 416; *Midwater Trawlers Cooperative*, 727 F.Supp. at 14–16.

Accordingly, for the reasons set forth above, Connecticut's motion for summary judgment is DENIED with respect to its first lawsuit filed against the Secretary and the Secretary's cross-motion for summary judgment is GRANTED with respect to Connecticut's first lawsuit.

### C. The 98 CV 173(CFD) Action

The second lawsuit filed by Connecticut seeks judicial review of the Secretary's decision to deny Connecticut's petition for rule making. *See* Decision on Petition for Rulemaking for Redistribution of the Summer Flounder Quota, 63 Fed.Reg. at 2,651. The second lawsuit is brought in five counts with each count alleging that the Secretary's denial of Connecticut's petition for rule making violated a different National Standard: Count One alleges a violation of National Standard One; Count Two alleges a violation of National Standard Four; Count Three alleges a violation of National Standard Five; Count Four alleges a violation of National Standard Seven; and Count Five alleges a violation of National Standard Ten.[17] Connecticut claims that the Secretary, by denying the petition for rule making and opting to maintain the status quo, acted in an arbitrary and capricious manner and in derogation of his statutory authority or limitations.

Connecticut's specific dispute with the Secretary's denial of the petition for rule making is two-fold. The first area of contention is that the Secretary refused to replace the state-by-state quota system with a coast wide quota system. The second is that the Secretary did not alter the method used to allocate the state-by-state quota percentages. After reviewing the Secretary's written decision and the administrative record in this case, the court finds that the Secretary's decision to deny

---

**17.** The relevant National Standards are:

National Standard One: Conservation and management measures shall prevent over fishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

National Standard Four: Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fisherman, such allocation shall be (A) fair and equitable to all such fisherman; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

National Standard Five: Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no measure shall have economic allocation as its sole purpose.

National Standard Seven: Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

National Standard Ten: Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a)(1), (4), (5), (7), (10).

Connecticut's petition for rule making was not arbitrary or capricious and was consistent with his statutory authority under the Magnuson–Stevens Act.

Connecticut's principal argument is that the Secretary failed to adequately consider Connecticut's petition for rule making and that the decision issued by the Secretary does not provide a sufficient explanation for denying Connecticut's petition. Connecticut also concludes from the Secretary's decision that he improperly deferred to the decision made by the Council and Commission to maintain the state-by-state quota system through their failure to recommend a coast wide quota system in Amendment 10, and the decision of the Commission's Summer Flounder Management Board not to recommend Amendment 11 to the full Commission.

The court finds that the written decision issued by the Secretary provides a sufficient justification and basis for his denial of Connecticut's petition. Although a large portion of the Secretary's justification does come from the recent decisions made by the Council and Commission concerning Amendment 10 and Amendment 11, this fact alone does not automatically lead to the conclusion that the Secretary simply deferred to the judgment of the Council and Commission without independently considering Connecticut's petition for rule making.[18] The fact that the Secretary's decision is consistent with those of the Council and Commission is also not suspect, provided, of course, that the administrative record supports the Secre-

tary's decision and that the state-by-state quota system retained by the Secretary is consistent with the Magnuson–Stevens Act, the National Standards, and any other applicable laws. 16 U.S.C. § 1853(a)(1)(c). In this case, however, the court does find that the administrative record supports the Secretary's decision and that the state-by-state quota system is consistent with the Magnuson–Stevens Act, the National Standards, and other applicable laws.

### 1. The State–by–State Quota System

■■■■ The Secretary's published decision denying Connecticut's petition for rule making states that, when considering Connecticut's challenge to the quota system, he reviewed the Council record relating to Amendment 10, which considered but did not adopt two proposed coast wide alternatives to the state-by state quota system. The Secretary noted that the Council and Commission both concluded that neither of the alternative quota systems proposed by Connecticut could provide the same level of equity as the current system, particularly among the northern and southern states and between the small day boats and larger offshore vessels. Specifically, the Secretary stated:

> Given that the Council and Commission thoroughly considered these proposed alternatives before proposing to retain the state-by-state allocation system and that the Council's actions were determined to be consistent with the [Magnuson–Stevens Act], the national standards, and other applicable laws, NMFS

---

18. Given that the Council and Commission had recently considered the same issues raised by Connecticut's petition, their decisions were relevant to the Secretary's consideration of Connecticut's petition. It is also worth noting that the Regional Director of the NMFS was a member of both the MAFMC and the ASMFC Summer Flounder Management Board and either he or a representative from the NMFS participated in Council and Board meetings. *See* 16 U.S.C. § 1852(b) (regional director of NMFS, or his designee, appointed voting member of MAFMC); Record A 10 at 115 (listing Summer Flounder Management Board members including An-

drew Rosenburg, Regional Director of the NMFS); Record A11 at ex. (b) p. 1 (listing Harry Mears of NMFS as being in attendance at Summer Flounder Management Board meeting held October 21, 1997, when proposed Amendment 11 was considered and voted down). The NMFS also had the responsibility (delegated by the Secretary) of deciding Connecticut's petition for rule making. It is reasonable to assume, therefore, that the NMFS did not consider Connecticut's petition in a vacuum and that a certain degree of institutional knowledge of the issues raised by Connecticut's petition existed within NMFS even before the petition was filed.

could find no compelling justification for any action other than what was approved in Amendment 10. Decision on Petition for Rulemaking for Redistribution of the Summer Flounder Quota, 63 Fed.Reg. at 2,652; Record Pet. at 135.

The Secretary went on to state that since the current state-by-state quota system had already been approved and found to be in compliance with the Magnuson–Stevens Act and other applicable laws, any changes to the quota system would be better handled through the FMP amendment process, where all members of the affected public could comment on any proposed measures. Decision on Petition for Rulemaking for Redistribution of the Summer Flounder Quota, 63 Fed.Reg. at 2,652; Record Pet. at 135.

Connecticut argues that the Secretary should have exercised his independent authority to override what it believes was an overly politicized vote by the Council and Commission, where the "haves" (states with high quota percentages) outnumbered the "have nots" (states with low quota percentages). Connecticut maintains that the states with high quota percentages voted against the alternative quota systems only because they reduced those states' shares of the summer flounder catch.

The fact that the Secretary's denial of the petition for rule making was consistent with the decision made by the Council and Commission, however, does not necessarily lead to the conclusion that the Secretary's decision was arbitrary and capricious. Connecticut's argument also fails to adequately consider Congress's delegation of the duty to develop fishery quota systems to the Council. *See, supra,* Section III.B. (noting Secretary's limited authority under 16 U.S.C. § 1854(c)(3) to develop a limited access system). Further, the administrative record demonstrates that the Secretary's decision was proper because the information available to the Secretary when he made his decision provides a basis for

his conclusion that the state-by-state quota system is consistent with the Magnuson–Stevens Act, the National Standards, and other applicable laws. *Cf. Alaska Trawler,* 831 F.2d at 1464 ("If the Secretary has followed the appropriate rule making procedures and has established a rational basis for his action in promulgating regulations based on the submitted amendment, procedural challenges for irregularities at the council level will not provide a justification for invalidating regulations.").

The Secretary's view that the FMP amendment process is the proper method of revising the quota system (instead of the Secretary using his own rule making authority) is supported by Congress's delegation of the responsibility for developing fishery quotas to the Council. Congress made it clear in the Magnuson–Stevens Act that the Secretary may not amend an FMP to establish a limited access system unless it is first approved by a majority of the appropriate Council. 16 U.S.C. § 1854(c)(3). Delegation of this authority to the Council shows Congress's preference to have the Council, with its recognized expertise and required representation of various interests, *see* 16 U.S.C. § 1852(b)(1), (2) (providing for a mix of Council members taken from the member states who have occupational experience, or scientific expertise or training, and who are knowledgeable regarding conservation and management, or the commercial or recreational harvest, of the fishery), creating quota management systems for fisheries, not the Secretary alone. The Secretary's role in the process is to ensure that any amendment to the FMP concerning a limited access system is consistent with the Magnuson–Stevens Act, the National Standards, and other applicable laws. So long as the state-by-state quota management system approved by the Council and Commission is consistent with the National Standards and other applicable law, the Secretary may not replace it with an alter-

native he prepares on his own.[19]

The Secretary's decision also sets forth a sufficient justification to deny Connecticut's petition for rule making. In his response to a comment letter received from Connecticut Senators Dodd and Lieberman and Representative Gejdenson, the Secretary found that a coast wide quota system would not provide the same level of flexibility afforded under the state-by-state quota system. The Secretary noted that since the state-by-state quota system was first put into effect in 1993, each state has developed and refined management systems to account for the seasonal variations in the availability of summer flounder and the types of fishing vessels that harvest summer flounder. The Secretary also found that uniform landing limits necessary to any coast wide quota system would not be suitable for all vessels, gears and areas. The Secretary concluded that the two coast wide quota systems proposed by Connecticut would not provide the same level of equity throughout the fishery as the state-by-state system.

Finally, the administrative record supports the Secretary's decision. The administrative record shows that the final version of Amendment 10 approved by the Council and Commission contained a thorough discussion of the same alternative quota systems proposed by Connecticut even though it did not recommend replacement of the existing state-by-state quota system. Record A10 at 381–87. The administrative record contains numerous meeting transcripts, letters, and memos which address the state-by-state quota system and the various coast wide quota alternatives. The administrative record also contains a report (the "Report") discussing alternative quota systems for the summer flounder fishery. Record A10 at 10–46. That Report, dated March 25, 1996, was prepared by the Council staff and distributed to the Council, the Commission's Summer Flounder Management Board, and the Commission's Quota Committee. The Report discusses the various coast wide quota alternatives to the current state-by-state quota system and changing the base period used to allocate the quota to the states. The Report concluded that the existing state-by-state quota system was the preferred management system for the summer flounder fishery. It also does not appear from the record that a more recent report discussing the impact of a coast wide quota system on the summer flounder fishery exists.[20]

Connecticut has not shown that the record conclusively demonstrates either of Connecticut's proposed coast wide quota alternatives would be superior to the existing state-by-state quota system. Thus, this is not like the situation presented in *Massachusetts v. Daley*, 10 F.Supp.2d 74, 77–79 (D.Mass.1998), where the court voided a regulation adopted by the Secretary, who had ignored a report which demonstrated his regulation was based on inaccurate records.

What is apparent from the administrative record is that there may not be a perfect conservation management system for summer flounder that satisfies all of the groups dependant upon the summer flounder fishery, while also providing a framework for increasing the total number of summer flounder in the fishery. But the administrative record also does not demonstrate that a coast wide quota system would be superior to the current state-by-state quota system.

19. To the extent Connecticut's petition for rule making can be interpreted as a request to have the Secretary repeal or revoke the summer flounder FMP, a three-quarters majority of the voting members on the Council would be needed before the Secretary could take such action. *See* 16 U.S.C. § 1854(h).

20. The Magnuson–Stevens Act does not put an affirmative burden on the Secretary to obtain the best scientific information available concerning the impact of the various quota alternatives on the summer flounder fishery. *See Washington Crab Producers*, 924 F.2d at 1444; *Massachusetts v. Daley*, 10 F.Supp.2d 74, 77 (D.Mass.1998).

Several states, including Connecticut, have complained that

the current [state-by-state quota] system forces them to travel hundreds of miles to land summer flounder in other states with open fisheries and higher landing limits. As a result, they argue that there is a loss of revenue to the New England states and fishermen's lives and vessels are put at unnecessary risk due to the adverse conditions they might encounter. In addition, they also indicate that the state-by-state allocations have caused states to promote their own interests at the expense of cooperative interstate management of summer flounder. They also indicate that the state shares associated with the current system are unfair to New England fishermen because these small shares put them at a competitive disadvantage when fishing in federal waters alongside fishermen from other states. Finally, they argue that the current system is inequitable and discriminates between residents of different states because of the method used to determine the individual state shares.

Record A10 at 339.

Portions of the administrative record maintain that a coast wide quota system might reduce state allocation issues. A coast wide quota system, it is argued, might also be designed to streamline the management system and make the availability of summer flounder more predictable for those whose livelihood depends upon the summer flounder harvest.

In contrast, however, the administrative record also indicates that there are potentially significant problems with a coast wide quota system and coast wide landing limits. The alternative coast wide quota systems proposed by Connecticut could result in derby-style fishing and earlier closure of the fishery. The record also shows that the alternative coast wide quota systems could decrease annual gross revenues and net benefits in the short and long term for many fishery participants. Record A10 at 359. The alternative coast wide quota systems would also require an extensive administrative effort and cost to install and operate. Finally, the record demonstrates that:

it will be difficult to design a system [with coast wide landing limits] that provides for an equitable allocation of the quota to northern and southern participants as well as between smaller day boats and larger offshore vessels. Uniform landing limits may not be suitable for all vessels or all areas. The result could be a redistribution of the summer flounder catch geographically and between vessel types.

Record A10 at 340.[21]

When the Secretary is faced with conflicting views and chooses among them, his decision cannot be termed arbitrary and capricious by that fact alone. *See Associated Fisheries of Maine, Inc.,* 127 F.3d at 110. In such a situation, "the [Secretary] must then exercise [his] judgment in moving from the facts and probabilities on the record to a policy conclusion." *State Farm Mut. Auto. Inc. Co.,* 463 U.S. at 52, 103 S.Ct. 2856.

Ultimately, the record shows that the Secretary's decision was made in good faith, pursued with a proper understanding of his authority, based on the best information available, and adequately justified. As a result, the court finds that, with respect to the coast wide quota system, the

---

21. A coast wide quota system similar to Connecticut's suggested coast wide quota alternative for summer flounder was recently enacted for scup, a species of fish with similar migratory patterns as the summer flounder. See Amendment to Scup Commercial Quota Harvest, 62 Fed.Reg. 27,978 (1997) (to be codified at 50 C.F.R. pt. 648). The scup FMP took eighteen years to develop and was amended immediately after it was approved. *See id.* Like the summer flounder's state-by-state quota system, the scup coast wide quota system is also the subject of dispute. *See Massachusetts v. Daley,* 10 F.Supp.2d 74 (D.Mass.1998).

Secretary's decision to deny Connecticut's petition for rule making was neither an abuse or discretion nor rendered in an arbitrary or capricious manner, and was consistent with the Secretary's Congressionally delegated authority.

## 2. The Method of Allocating the Quota Among the States

 The Secretary's decision also addresses Connecticut's proposal to alter the method by which the state-by-state quota is allocated among the states. Connecticut's petition proposed that any regulation adopting a state-by-state allocation of the summer flounder quota should be based on the number of fish landed during the period between 1990 and 1992, instead of the current allocation system based on landings between 1980 and 1989.

The Secretary denied Connecticut's petition and chose to maintain the current allocation method, stating:

> [t]he Council and Commission further noted that revising the years for the baseline allocation to 1990–92 was discussed at length during the development of Amendment 10. This time period was rejected under Amendment 10 because the shorter time period did not account adequately for historical participation in the fishery when summer flounder were more abundant and generally more available to the fishery along the entire coast. In light of the deficiencies noted in the alternatives, the Council and Commission decided to maintain the current state-by-state system.

Record Pet. at 135.

The Secretary also specifically addressed the quota allocation issue in the "Comments and Responses" section of his decision:

> When the quota allocation system was developed, the Council and Commission reviewed the history of the fishery and recommended a 10–year time frame as the appropriate historical period upon which quotas would be based. This decision was discussed thoroughly. While

proposals were made to shorten the period to as little as 3 years, it was recognized that short-term variations in landings did occur and that quotas based on a short time series would penalize one segment of the fishery while granting others what was considered an excessive share. The states [including Connecticut], through the Commission, approved the 10–year time period and the method of allocating the quota.

Record Pet. at 138.

The administrative record supports the Secretary's decision to maintain the sampling period. The Report that was prepared for the Council's consideration and included in the administrative record for Amendment 10 evaluated a quota allocation method based on landings from 1990 through 1992. The Report states that one of the arguments for using landings from 1990 through 1992 as the base period is to avoid penalizing the northern states for their voluntary conservation efforts in the 1980s. The proponents of the 1990–92 alternative argued that, by increasing minimum size requirements, the northern states landed fewer fish than they otherwise would have landed and, as a result, their quota percentages are unfairly reduced.

Conversely, the southern states were able to land smaller fish in the 1980s. The proponents of the 1990–92 alternative, including Connecticut, believe this allowed the southern states to land more fish in the 1980s, and therefore any quota system based on landings from 1980 through 1989 unfairly favors the southern states.

The Report indicates that the issue of how to fairly allocate the summer flounder quota among the states was discussed extensively when Amendment 2 was developed in 1991. The conclusion reached at that time was that using landings data taken from 1980 through 1989 was the fairest way to allocate the quota among the states. The Report, which was prepared in 1996, concludes that no change in the

allocation method was warranted. The Report stated:

"[u]ntil someone can determine the availability of sublegal and legal summer flounder to fishermen in each state during the time period in question and then devise a formula that would account for both changes in effort and landings as well as be fair to all the participants, the 'what if' question of probable landings cannot be determined."

Record A10 at 14.

The Report also recognized that "an argument can be made to support either of the two landing periods. The 1980–89 period reflects the historic pattern of landings when summer flounder were more abundant. The 1990–92 period would be more characteristic of recent patterns in the fishery and reflect regulations implemented after the Summer Flounder FMP was put in place in 1989 [but before the state-by-state quota system was adopted]." Record A10 at 12.

During the Amendment 10 process the Council and Commission both voted against changing the quota allocation to reflect landings from 1990 through 1992, although the Commission's Policy Board directed its Summer Flounder Management Board to consider the possibility of revising the quota allocation method. Record A10 at 310. The proposal from this effort became Amendment 11.

The initial effort at drafting Amendment 11 fell to the Commission's Summer Flounder Technical Committee. Connecticut submitted a study it had prepared for an allocation system based on landings

from 1990 through 1992.[22] The Technical Committee reviewed the analysis and, with some adjustments, approved the analysis for consideration by the Commission's Summer Flounder Management Board.

The Management Board considered the Technical Committee's report at the Commission's annual meeting held in October 1997. During the meeting, the Management Board extensively discussed the issue of quota allocation. Several arguments, both for and against modifying the quota allocation, were put forth by the Management Board members and the public in attendance. The Management Board questioned the scope of the analysis that went into Amendment 11, suggesting that the Technical Committee only looked at one of several factors to be considered in determining whether an adjustment should be made to account for differences in size limits among the states between 1980 and 1989.[23] Record A11 at Ex. (b) p. 9–13. The Connecticut delegate to the Management Board even acknowledged that there were some "issues" with respect to the Technical Committee report. Record A11 at Ex. (b) p. 12.

One criticism of the Technical Committee report was that, in addition to recommending an adjustment to the quota allocation because of the difference in size limits allowed by the northern and southern states, the Technical Committee report also said that "flounder fishermen could easily offset any reduced landings following imposition of a size limit." *Id.* Some Management Board members argued that this demonstrated that if the southern

---

**22.** This is the same study submitted to the Secretary in support of Connecticut's petition for rule making.

**23.** One person at the Management Board meeting summed up this critique of the Technical Report by stating:

"Given that Mr. Chairman, it seems that [there] is [a] fundamental flaw [in] Amendment 11. It takes one piece of information and attempts to use that to reallocate the resource when there are five or six other problems or pieces of information that should be looked at in concert that have been offered by half of the people sitting around this Board over the past four months, things like availability of the fish or distribution by size, changes in market, the fact that some states had rules in place like bans on trawling or mesh sizes that affect landings in their states. All of these things are being ignored in favor of a single data set." Record A11 at Ex. (b) p. 11 (commentary by Jack Travelstead).

states had instituted similar size restrictions at the same time as the northern states, the amount of summer flounder landed in southern states would not change since the southern fishermen would simply discard more undersized fish until they had the same amount of legal-sized fish. *Id.*

Another criticism of adjusting the quota allocation to account for the different size limits between northern and southern states is that doing so would ignore the natural migratory pattern of summer flounder since they generally grow in size as they migrate north. There are also statements from both northern and southern fishermen that southern fishing boats were responsible for a large portion of the existing quota allocated to the northern states. The southern states' fishermen argued that in light of the recent practice by all states of enacting protective measures to keep quota allotments for in-state boats only, northern fishermen are reaping the benefits of the southern fishermen's fishing efforts from 1980 through 1989. Record A11 at Ex. (b) p. 8.

An additional factor which supports the Secretary's decision to maintain the current quota allocation method concerns the length of the time period used to measure summer flounder landings. Despite Connecticut's view that the 1990 through 1992 period will be more accurate because all of the states in the fishery had similar size requirements, Connecticut has not adequately addressed the view expressed in the record that using a shorter three year period to calculate the quota allocation does not provide as accurate a picture of the summer flounder landings patterns as compared to using a ten year period.

All of the alternatives that were proposed by the Technical Committee were based on landing periods of at least seven years. It is significant that the Technical Committee was given the same study that Connecticut submitted with its petition, and the recommended alternatives from the Technical Committee (after reviewing the report) were all substantially longer than three years. Connecticut's petition only gave the Secretary the option of choosing between a ten year period and a three year period and the Secretary's decision to maintain the ten year period cannot be considered arbitrary or capricious.[24]

The court concludes that there is a sufficient basis in the record for the Secretary to deny Connecticut's petition for rule making and maintain the present base period for allocating the summer flounder quota among the states. *See C & W Fish Co.,* 745 F.Supp. at 8 ("[T]he question is whether the decision made by the [Secretary] finds support in the administrative record."). Therefore, similar to the finding that the Secretary's decision to retain the state-by-state quota system over either of Connecticut's proposed coast wide alternatives was proper, the court's review of the record leads to the conclusion that the Secretary's decision concerning the quota allocation method was made in good faith, pursued with a proper understanding of his authority, based on the best information available, and adequately justified in the record. As a result, the court finds that the Secretary's decision to deny Connecticut's petition for rule making was neither an abuse of discretion nor rendered in an arbitrary or capricious manner, and was consistent with the Secretary's Congressionally delegated authority.

### 3. National Standards

At the outset of this discussion of the National Standards, the court notes that Connecticut's petition for rule making only challenged the state-by-state quota system on the ground that it violated National Standard Four. The issue of compliance

---

**24.** It is also not arbitrary or capricious to choose to maintain a quota allocation method that considers historical landings patterns. Rather, that is one of the criteria that Congress said should be considered when establishing a limited access system. 18 U.S.C. § 1853(b)(6)(B).

with National Standards One, Five, Seven, and Ten was only raised in a comment letter submitted from the Commissioner of the Connecticut Department of Environmental Protection ("Connecticut DEP"). Record Pet. at 62–64. Connecticut's second lawsuit, however, challenges the Secretary's decision on the ground that he did not adequately address the concerns raised by Connecticut with respect to National Standards One, Five, Seven, and Ten, and not just National Standard Four.

It is a fair question whether the Secretary must respond in detail to each and every comment received, or if he is only required to respond to what was raised in the actual petition for rule making. *See* 5 U.S.C. § 555(e) ("Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with an agency proceeding. . . . [T]he notice shall be accompanied by a brief statement of the grounds for denial."); *WWHT, Inc.*, 656 F.2d at 813 ("[A]n agency is required to give 'prompt notice,' along with a brief explanation, whenever *petitions* for rule making are denied.") (emphasis added). Without resolving the question, the court finds that the explanation given by the Secretary concerning National Standards One, Four, Five, Seven and Ten is sufficient. Moreover, the administrative record provides an adequate basis for the Secretary's determination that the current state-by-state quota system is consistent with each of the National Standards challenged in Connecticut's second lawsuit.

### i. National Standard One

■ National Standard One requires that "[c]onservation and management mea-

sures shall prevent over fishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 18 U.S.C. § 1851(a)(1). Connecticut argues that the state-by-state quota system has failed to satisfy National Standard One because the fishing mortality rate, designated as the factor (F), for 1996 fell short of the targeted goal.[25] Connecticut also argues that the Secretary failed to give a reasoned explanation for his decision. Both of these arguments fail.

The Secretary acknowledged in his decision denying Connecticut's petition that the most recent summer flounder stock assessment estimated the mortality rate for 1996 at 1.0, which exceeds the target of 0.24. The Secretary pointed out, however, this level was down significantly from the peak mortality rate of 2.1 in 1992.[26] The Secretary also reported that the age structure of the summer flounder biomass[27] was improving and the spawning stock biomass estimate for 1996 was at its highest level since 1983. According to the Secretary, the most recent stock assessment showed that summer flounder were at a medium level of historical (1968–96) abundance, but were still overexploited. While the improvement of the stock may not be occurring as quickly as was originally anticipated, the Secretary determined that "[o]verall, the [summer flounder] management scheme is allowing a stock rebuilding and a progression toward the end of over-fishing." Record Pet. at 137.

On this record, the Secretary's decision to maintain the state-by-state quota system is not arbitrary and capricious. The 1997 stock assessment report provides a rational basis for his decision.[28] The effect

---

25. The fishing mortality rate is a statistical calculation that "expresses the depletion of the stock of fish attributable to fishers, whether by capture or discard of fatally wounded fish or otherwise, in a given year." *Fishermen's Dock Co-op., Inc.*, 75 F.3d at 166.

26. This is also down from the mortality rate for 1995, which was 1.5. Record A10 at 174.

27. Biomass is defined as the total amount of living matter in a defined area or habitat. *See* Merriam Webster's Collegiate Dictionary 115 (10th ed.1997)

28. Although the 1997 stock assessment report itself was not in the administrative record, Connecticut does not dispute the statistical findings in the report. The court, therefore,

of the Secretary's denial of Connecticut's petition is that he kept in place a quota system with a record of rebuilding the summer flounder fishery stock. *See Fishermen's Dock Coop., Inc.*, 75 F.3d at 172 ("As long as everyone agrees, as everyone does, that the regulations do not require 100% assurance [of reaching a target mortality rate], the choice of how much assurance to indulge in must be a policy choice left to the reasonable exercise of the discretion of the [Secretary]."). The alternative coast wide quota proposals offered by Connecticut cannot assure that either would be more effective in rehabilitating the summer flounder stock. Accordingly, the court finds that the Secretary's decision was consistent with National Standard One.

### ii. National Standard Four

█ National Standard Four requires that "[c]onservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fisherman, such allocation shall be (A) fair and equitable to all such fisherman; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 18 U.S.C. § 1851(a)(4). Connecticut argues that the current system for allocation of the annual coast wide quota violates National Standard Four.[29]

The Secretary's decision stated that no alternative system was identified that could provide the same level of equity as the current system, particularly among the northern and southern states and between small day boats and larger offshore vessels. In addition, the Secretary observed

that altering the method of calculating the quota percentages from 1980 through 1989, and substituting the period from 1990 through 1992, would not adequately account for historical participation in the fishery when summer flounder were more abundant.

As previously discussed, there is much justification in the record for the Secretary to continue the state-by-state quota system instead of changing to either of the alternative coast wide quota systems. Furthermore, the use of historical landings patterns from 1980 through 1989 is sufficiently justified by the record. The Secretary, Council, and Commission are required to prepare a management and conservation system fair and equitable to all fishermen in the summer flounder fishery and, based on the record, they have satisfied that requirement.

The court appreciates Connecticut's frustration with what it feels is an unfairly low allocation of the summer flounder quota. However, the regulation setting forth the quota percentages, 50 C.F.R. § 648.100(d), indicates that Maryland, Delaware, New Hampshire and Maine all have a smaller share of the quota than Connecticut. In addition, the fact that some of the southern states have a much larger percentage of the quota, particularly Virginia (21%) and North Carolina (27%), does not necessarily mean that those states have an excessive share of the quota. The quota is based on historical fishing patterns and it does not follow that the quota should be evenly distributed among the various states when, historically, the states did not fish for summer flounder with the same frequency or effect.

The hardship felt by the conservation and management efforts for summer flounder appears to be shared by many

will treat the Secretary's reference to the data contained in the report as accurate. *See* Record Pet. at 137. The court does so separately, of course, from its consideration of Connecticut's dispute over the conclusions drawn by the Secretary from the collected data.

**29.** Connecticut's complaint only challenges the quota allocation method under National Standard Four, not the decision to maintain the state-by-state quota system over a coast wide quota system.

fishermen, not just those from the northern states. Indeed, North Carolina and Virginia fishermen are faced with early closures of their fishery and low trip limits, much like Connecticut fishermen. *See, e.g.*, Lorelei Stevens, Summer flounder quota woes: North Carolina fishery already shuts down as NMFS adjusts for '96 quota overages, Commercial Fisheries News, February, 1997, at 1A, 14A; Record A10 at 126. There is also some basis in the record to find that fishing boats from southern states landed summer flounder in northern states' ports during the 1980s, which means that a portion of the quota allotted to the northern states is based on the fishing efforts of southern boats. *See, e.g.*, Record A11 at Ex. (b) p. 8.

The court will not vacate the Secretary's decision when the record supports the finding that the state-by-state quota is a reasonable effort to fairly allocate the quota to summer flounder fishermen throughout the fishery. The same holds true with respect to the quota allocation method. There is ample evidence in the record to suggest that the present allocation based on historical participation is fair and no individual, corporation, or other entity (including individual states) has an excessive share of the quota. Accordingly, the court finds the present state-by-state quota system and quota allocation method are consistent with National Standard Four.

### iii. National Standard Five

■ National Standard Five requires that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no measure shall have economic allocation as its sole purpose." 18 U.S.C. § 1851(a)(5). Connecticut contends that the state-by-state quota allocation system creates inefficiencies in the harvesting of summer flounder because commercial fishermen have to travel to ports in adjacent states to land and sell their catch. However, the Secretary has

considered efficiency (all that is required under this standard) and National Standard Five makes it clear that "efficiency, though important, is neither the sole nor primary objective of conservation and management measures." *J.H. Miles & Co.*, 910 F.Supp. at 1154. Therefore, the fact that some inefficiencies may exist in a conservation and management system does not make the system inconsistent with National Standard Five.

■ The Secretary's explanation of his decision in light of National Standard Five is that the Council and Commission developed a system that was intended to operate at the lowest possible cost with regard to effort, administration and enforcement. The Secretary also stated that NMFS had determined that the state-by-state quota system makes efficient use of fishery resources. Connecticut argues that this explanation is inadequate.[30]

The Secretary's response demonstrates that he did consider efficiency when he decided to retain the state-by-state quota system. He observed, along with the Council and Commission, that many states have developed quota management systems that can effectively account for different vessel sizes and seasonal variations in abundance. The Secretary indicates that this flexibility would be lost to states under a coast wide quota management system. Accordingly, the Secretary's decision to deny Connecticut's petition for rule making is consistent with National Standard Five.

### iv. National Standard Seven

■ National Standard Seven requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). As with National Standard Five, the Secretary does not need to conduct a formal cost/benefit analysis under National Standard Seven. *Alaska Factory Trawler Ass'n*, 831 F.2d at 1460. Furthermore, the

---

**30.** The Secretary does not have to conduct a formal "cost/benefit" analysis. *Alaska Facto-* ry Trawler Ass'n, 831 F.2d at 1460; *J.H. Miles & Co.*, 910 F.Supp. at 1155.

language of National Standard Seven provides that costs should be minimized and duplication avoided where practicable, not absolutely.

The Regulations concerning National Standard Seven instruct that management measures should not impose "unnecessary burdens on the economy, on individuals, on private or public organizations, or on Federal, state or local governments. Factors such as fuel costs, enforcement costs, or the burdens of collecting data may well suggest a preferred alternative." 50 C.F.R. § 600.340(c). The Regulations also provide that "an evaluation of effects and costs, especially of differences among workable alternatives, including the status quo, is adequate." 50 C.F.R. § 600.340(d).

Connecticut's argument with respect to National Standard Seven is that the Secretary ignored Connecticut's concerns about the amount of travel the state-by-state quota system puts on the fishermen and the adverse impact the forced travel has on the economic infrastructure of the commercial fishing industry in Stonington, Connecticut. Although the Secretary's written decision does not directly address this point, which was also raised in the comment letter submitted by the Commissioner of the Connecticut DEP, he did state that new compliance criteria designed to keep enforcement and administrative costs down while also making it easier to monitor the integrity of the quota were enacted as part of Amendment 10.

This statement of reasons demonstrates that when the Secretary considered Connecticut's petition he determined the existing state-by-state quota system was consistent with National Standard Seven. Moreover, Connecticut's argument only focusses on one of the possible costs relevant to National Standard Seven and Connecticut has not challenged the new compliance criteria established with Amendment 10 as being inconsistent with the requirements of National Standard Seven. The court is satisfied from the record that the Secretary, in addition to the Council and Commission, considered the costs and burdens associated with the various quota alternatives before installing the present system and that the system itself is designed to minimize costs and avoid unnecessary duplication. Accordingly, Connecticut's argument that the Secretary's decision violates National Standard Seven is unavailing.

### v. National Standard Ten

■ National Standard Ten requires that "[c]onservation and management measures shall, to the extent practicable, promote the safety of human life at sea." 16 U.S.C. § 1851(a)(10). Connecticut argues that the state-by-state quota system encourages boats to steam in bad weather to reach a port where summer flounder could legally be off-loaded. How the state-by-state quota system exacerbates this problem is questionable since, by Connecticut's own admission, states have enacted legislation which limits landings in their ports to boats with an historical association with those ports. Connecticut's Mem. of Law in Supp. of Mot. for Summ. J. at 9 n. 3. According to Connecticut, under the present system, Connecticut's boats will either be barred from landing fish in a particular state, in which case extra travel is not warranted, or the boats will be able to land in other states' ports because the boats have historically landed fish in those ports irrespective of the state-by-state quota system enacted in 1992. In those instances, it is not shown how the state-by-state quota system would exacerbate the problem of safety at sea.

In addition, there is no assurance that, if the Secretary had established a coast wide quota system, the states would eliminate the regulations that prevent out-of-state boats from landing fish in foreign states' ports. Further, assuming the state regulations limiting port landings would no longer be necessary with a coast wide quota system in place, boats would again be able to (and probably would) land fish all along the coast as they did prior to the

enactment of the state-by-state quota system.

The Secretary's response to Connecticut's concerns about safety in light of National Standard Ten makes note of the historical travel patterns of fishing boats to land summer flounder. The Secretary's conclusion that the state-by-state quota does not exacerbate a vessel's travel at sea and is consistent with National Standard Ten has a rational basis. Accordingly, Connecticut's argument that the Secretary's decision does not comply with National Standard Ten is unavailing.

## IV. CONCLUSION

Based on the evidence contained in the administrative record, the court concludes that the current quota system for summer flounder is consistent with the Magnuson–Stevens Act, the National Standards and other applicable law. The Secretary, in continuing the present state-by-state quota system for summer flounder, duly considered the arguments of Connecticut but acted within his discretion when he rejected the proposals contained in Connecticut's petition for rule making. There is also adequate support in the administrative record to support the Secretary's decision.

For the foregoing reasons, Connecticut's motion for summary judgment is DENIED and the Secretary's motion for summary judgment is GRANTED. The clerk shall enter judgment for the defendant in the 97 CV 2726 action and the 98 CV 173 action.

SO ORDERED.