10 F.Supp.2d 74 (1998)
COMMONWEALTH OF MASSACHUSETTS, by its DIVISION OF MARINE FISHERIES, Plaintiff,
v.
William M. DALEY, in his official capacity as Secretary of Commerce of the United States, United States Department of Commerce, James Baker, in his official capacity as Under Secretary and Administrator for the National Oceanic and Atmospheric Administration, National Oceanic and Atmospheric Administration, Rolland A. Smitten, in his official capacity as Director of the National Marine Fisheries Service, National Marine Fisheries Service, and the United States of America, Defendants.
No. 97-11400-JLT.
United States District Court, D. Massachusetts.
June 24, 1998.
*75 Douglas S. Brown, Attorney General's Office, Administrative Law Division, Boston, MA, for Plaintiff.
Warigia Bowman, U.S. Department of Justice, Wildlife and Marine Resources, Washington, DC, for Defendants.
David Farrell, Jr., John H. Sweeney, Connors & Farrell, South Chatham, MA, for Movants.

MEMORANDUM
TAURO, Chief Judge.
Plaintiff, the Commonwealth of Massachusetts, by its Division of Marine Fisheries, petitions for judicial review of a final rule promulgated by the Secretary of Commerce, Defendant William M. Daley. The rule amends a portion of the Fishery Management Plan for the Summer Flounder, Scup, and Black Sea Bass Fisheries, 50 C.F.R. § 648.120. Among other things, the amendment revises the method for allocating, among the states, the commercial quotas for summer scup fishing.
Plaintiff seeks this review, alleging that the regulatory amendment is "arbitrary, capricious, [and] an abuse of discretion," in that it is based upon unreliable and outdated data. See 5 U.S.C. § 706(2)(A)(1996). Moreover, Plaintiff claims that the amendment is unlawful, because it is contrary to the national standards for fishery conservation and management, as set forth at 16 U.S.C. § 1851 et seq.
According to Plaintiff, the result of these deficiencies is a quota system that unfairly discriminates against residents of the Commonwealth of Massachusetts, as well as all "inshore" fishermen. Plaintiff prays for declaratory and injunctive relief.

I.

FACTUAL BACKGROUND

A. Scup

Scup are a schooling, continental shelf species common from Cape Cod, Massachusetts to Cape Hatteras, North Carolina. Scup have supported an important commercial fishery since colonial times.
Scup migrate seasonally, at least partially in response to changes in water temperature. In the winter months, scup reside in the deep offshore waters from southern New Jersey to Cape Hatteras. As the water temperature rises, they migrate north and inshore to spawn. Scup appear off the southern coast of New England in early May.
In accordance with this migratory pattern, winter commercial scup fishing is concentrated offshore at the southern end of the scup's range and is done mostly by large otter-trawling vessels. In contrast, the commercial *76 scup fishing that occurs during the summer months is done inshore, using smaller trawlers, pots, and rods-and-reels.

B. The Contested Regulation

The regulation being challenged allocates, on a state-by-state basis, the summer commercial fishing quota for scup. Notably, this regulation was not developed overnight. The effort to develop a fishery management plan ("FMP") for the scup fishery actually began in 1978. After being abandoned intermittently, an earnest development effort began in 1995, when the National Marine Fisheries Service ("NMFS") concluded that scup were an overexploited species. Finally, in July of 1996, the Secretary of Commerce adopted a FMP that set overall goals for reducing the annual scup catch.
By the time the 1996 regulation was approved, NMFS was already at work revising it. There were concerns that a coastwide quota would create "derby-like" fishing by the larger otter-trawling vessels and would cause the season to close before the scup ever migrated north. As a consequence, the season was divided into three periods, with each period receiving an allotment of the overall annual quota. This 1997 regulatory amendment, furthermore, apportioned the summer allotment among particular states. It is this latter allocation that is at the center of this controversy.
Massachusetts claims that these state-by-state quotas were established on the basis of outdated and unreliable data, resulting in a discriminatory system of allocation. Specifically, the state-by-state quotas were developed using a NMFS database for 1983-1992 scup landings by federally permitted boats.[1] Each state was allotted a share of the total quota for the summer season based on its historical landings of scup as reflected in the database. Massachusetts contends not only that this data is outdated, but also that the resulting quota is discriminatory, because the database includes catch information from only those vessels which were federally permitted.
A boat needs a federal permit to fish anywhere from 3 to 200 nautical miles offshore (i.e., in the "exclusive economic zone"). The administrative record shows, however, that, on average, 88% of the scup landed in Massachusetts were caught in state waters (i.e., "inshore" or within 3 nautical miles of the coastline) by boats that did not require a federal permit. Massachusetts claims, therefore, that the NMFS's database does not accurately reflect the scup caught and landed in Massachusetts.

II.

ANALYSIS

A. Standard of Review

As always, in conducting a review of an agency's actions, the court must decide whether the regulation in question is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1996); 16 U.S.C. § 1855(d) (1985)(incorporating the Administrative Procedures Act by reference).
In conducting this analysis with respect to a regulation promulgated pursuant to the Magnuson-Stevens Act (the "Act"), a court must be particularly cognizant of the ten national standards contained in the Act.[2]See 16 U.S.C. § 1851(a)(1)-(10) (1985 & Supp. 1997). Of those standards, two are especially relevant in this case.
National Standard # 2, 16 U.S.C. § 1851(a)(2), requires that "[c]onservation and management measures ... be based upon the best scientific information available." Id. And, National Standard # 4, 16 *77 U.S.C. § 1851(a)(4), provides, "Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various ... fishermen, such allocation shall be (A) fair and equitable to all fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." Id. Massachusetts claims that the 1997 regulatory amendment violates both of these standards.

B. National Standard # 2

The premise underlying Massachusetts' first argument is that NMFS had an "affirmative obligation" to collect landing data for scup caught in "inshore" waters before setting state-by-state quotas. By failing to do so, Massachusetts claims that NMFS violated National Standard # 2. The court finds, however, that this argument is based on an overly broad reading of the word "available" as it is used in National Standard # 2.
Notably, the Magnuson-Stevens Act does not define the phrase "best scientific information available."[3] In the absence of any express statutory language imposing an affirmative duty on an agency, courts have been reluctant to impose one. Compare Dubois v. Thomas, 820 F.2d 943, 947 (8th Cir.1987)(applying this idea in the context of a citizen's suit provision). More particularly, the case law interpreting National Standard # 2 seems to imply that it does not mandate any affirmative obligation on the agency's part. See Washington Crab Producers v. Mosbacher, 924 F.2d 1438, 1444 (9th Cir.1990). Indeed, in certain situations, the Secretary is free to act before the information on which he intends to rely is even "complete." See, e.g., National Fisheries Institute v. Mosbacher, 732 F.Supp. 210, 225 (D.D.C.1990). Consequently, the court declines to overturn the regulation on this basis.

C. National Standard # 4

The discretion afforded the Secretary in developing regulations on the basis of imperfect or incomplete information does not, however, give the Secretary the right to ignore data that already exists. See 50 C.F.R. § 600.315(b)(1), (c)(3). This is particularly true if doing so would result in a regulation that unfairly discriminates between fishermen from different states. See 16 U.S.C. § 1841(a)(4). Massachusetts' second, and more persuasive, argument is that the Secretary did just that, ignored existing data, when he approved the 1997 regulatory amendment. More fundamentally, in ignoring that data, the Secretary promulgated a regulation that he knew, or should have known, would allocate fishing privileges in an inequitable manner.
Specifically, Massachusetts complains that NMFS developed the 1997 regulatory amendment on the basis of data that it knew grossly underrepresented historic scup landings in the state. Massachusetts contends that, by focusing almost exclusively on scup landings by federally permitted vessels, the NMFS database understates Massachusetts' scup catch by, on average, 88%. Substantial evidence in the record validates Massachusetts' claim. Not only was NMFS generally aware of the scup's migratory pattern and its effect on its data collection efforts, but, in at least one instance, NMFS actually quantified the amount by which its database underrepresented Massachusetts' historic scup catch.
In formulating the original FMP for the scup fishery, NMFS maintained that its "weighout system records c[ould] be used to estimate the number of vessels landing scup." NMFS admitted, however, that "the data d[id] not constitute a complete census." Pl.'s Memo, Ex. A, at p. 34. More particularly, in responding to comments in the Federal Register, NMFS further conceded that the data "lacking" was for a "certain element[] of this fishery  notably landings from some states' inshore handline fisheries." R. 576 (emphasis added); see also Memorandum for Rolland Schmitten (April 14, 1997), at R. 556 *78 ("There is no estimate on the number of vessels taking part in the inshore fishery, as they could be, for the most part, state licensed and may not be completely represented in the database.")(emphasis added). This concession, in conjunction with NMFS's knowledge that scup migrate inshore during the summer months to spawn, warrants the court's finding that, by relying on its incomplete database, NMFS discriminated against Massachusetts' fishermen.[4]
More detrimental to NMFS's position, however, is the data contained in Table 17. Table 17, NMFS' own data, shows that, on average, 88% of the scup landed in Massachusetts were caught in state waters. Pl.'s Memo, Ex. A, at p. 101-02. In other words, NMFS knew that the data it was using underestimated Massachusetts' historic scup catch by, on average, 88%, and, yet, it chose to base the state-by-state quotas exclusively on this data. It was this decision that violated National Standard # 4.
NMFS' willingness to overlook the data contained in Table 17 was only compounded by the fact that Massachusetts continually objected to the use of this data throughout the rulemaking process and even provided NMFS with 1994 and 1995 data showing the inadequacies in its database.[5] For example, in a letter dated May 9, 1997, then-Governor William Weld complained that "the federal records used to determine the inshore quota share for Massachusetts may ... result in a gross underestimation of actual commercial [scup] landings." R. 563. He added, "This management approach will slash Massachusetts inshore scup landings from a current annual rate of 2-3 million pounds to about 360,000 pounds." Id.; see also Letter from Philip G. Coates to Andrew Rosenberg (March 5, 1997), at R. 536-42.
Data subsequently published in the Federal Register substantiate Governor Weld's concern. If Massachusetts fishermen had limited their scup catch to their 1997 quota, their overall catch would have been reduced by approximately 75%, whereas Rhode Island fishermen were allowed to land approximately 32% more scup in 1997, than they have historically landed. As it turns out, Massachusetts fisherman disregarded the new regulation and caught 1,428,183 pounds of scup in 1997, whereas Rhode Island fisherman failed to reach their allotment, falling short by over one million pounds. Adjustments to the 1998 Quotas, 63 Fed.Reg. 3478, 3479 (Jan. 23, 1998). There could be no better evidence than this of the disparate impact of NMFS's decision to use flawed data.[6]
In sum, although NMFS had no "affirmative obligation" to collect data on the inshore fishery, see supra, and although selecting the data on which to rely in developing a regulation is within the Secretary's discretion, see Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 110 (1st Cir.1997), the Secretary cannot choose to use data that he knows is seriously flawed. This is particularly true when doing so will have a discriminatory effect. Such a choice, the court finds, was arbitrary and capricious.

*79 D. Treatment of Bycatch

Massachusetts makes a third argument, which the court considers briefly only to note that NMFS's treatment of the "bycatch" issue does not violate either National Standard # 2 or National Standard # 4.[7] The 1997 regulatory amendment treats bycatch in the following manner: (1) Based on observations made by NMFS scientists placed on otter-trawling vessels as compliance officers, NMFS estimated that the mortality rate for scup caught and discarded to be near 100%; (2) the 1997 regulatory amendment, therefore, requires NMFS to estimate the total annual scup bycatch and to subtract this entire amount from the annual scup quota before beginning to allocate it across the three fishing periods and the various states within the summer season.
Massachusetts contends that this approach to bycatch is discriminatory and out of line with the "best scientific information available," because it provided NMFS with evidence that the mortality rate for the bycatch of pot and rod-and-real fishermen is much lower than 100%, and treating all states alike penalizes states like Massachusetts where the primary means of catching scup is not by using large otter-trawling vessels. But, by its own admission, the "evidence" that Massachusetts provided was either "anecdotal" or based on "assumptions" drawn from the study of other fisheries. Pl. Memo, p. 52. To the extent that Massachusetts presented any direct evidence of the mortality rate in the scup fishery, that evidence pertained only to recreational fishing. Id. (citing R. 5).
Although NMFS may need to develop a better understanding of bycatch morality rates in the scup fishery as it fine-tunes its regulations, the court finds no evidence in the record that NMFS failed to employ what, in its judgment, was the "best scientific information available." Massachusetts points to no such evidence, and NMFS's cautious approach to preserving the vitality of this fishery strikes the court as a reasonable one. See Southern Offshore Fishing Association v. Daley, 995 F.Supp. 1411, 1432 (M.D.Fla. 1998). Moreover, in the absence of better scientific information, the court fails to see how treating all states alike could violate National Standard # 4. The court, therefore, rejects Massachusetts' third argument.

III.

CONCLUSION
For the foregone reasons, the court finds that NMFS abused its discretion, but only in developing the state-by-state allocation of the summer commercial scup fishing quota and, accordingly, voids only that portion of the regulation. As ordered on April 27, 1998, the Secretary shall not seek to enforce the voided portion of the regulatory amendment, including the calculation of "overages," and shall, in due course, promulgate a new regulation that is consistent with National Standard # 4.
AN ORDER WILL ISSUE.
NOTES
[1] Note that the new quotas apply to both state and federally permitted vessels.
[2] The Magnuson-Stevens Act established eight regional fishery management councils composed largely of members representing the regions' costal states. See 16 U.S.C. § 1852 (1985). In the normal course of events, each council prepares a FMP for each fishery within its jurisdiction, see 16 U.S.C. § 1853 (1985), and submits it to the Secretary of Commerce for final approval. See 16 U.S.C. § 1854 (1985). The Secretary must evaluate the FMP for consistency with the Act's ten national standards. See 16 U.S.C. § 1851(a)(1)-(10) (1985 & Supp.1997). Once it is approved, the FMP becomes a valid final regulation. See 16 U.S.C. § 1855(d) (Supp.1997).
[3] In fact, even the regulation interpreting the phrase, quoted extensively in Plaintiff's brief, does not seem to imply any "affirmative obligation." See 50 C.F.R. § 600.315(b)(1)-(2), (c)(2)-(3).
[4] As the record shows, NMFS was also well aware that, by the time scup migrate north to the waters off the coast of New England, they reside in inshore waters. In describing the problem to be solved by the regulatory amendment, NMFS wrote, "A coastwide quota fails to recognize the seasonal fishing patterns in the commercial scup fishery, i.e., larger vessels operating offshore in the winter and smaller vessels and fixed gear operating inshore during the summer months." R. 262 (emphasis added).
[5] Note that the court does not think that the mechanism provided in the regulation for seeking an adjustment to a state's quota is a sufficient remedy. A state may only seek to have its quota amended on the basis of 1983-1992 data, much of which no longer exist. R. 539, 576.
[6] The court recognizes that "[i]nherent in an allocation is the advantaging of one group to the detriment of another," 50 C.F.R. § 600.325(c)(3)(i), and that "[a]n allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups." 50 C.F.R. § 600.325(c)(3)(ii); see also United Boatmen of New Jersey v. Mosbacher, 1992 WL 13197, at *5 (D.N.J. Jan.24, 1992). Title 16, Section 1851(a)(4) still requires, however, that fishing privileges be allocated in a "fair and equitable" manner. See 16 U.S.C. § 1851(a)(4). Relying on data that the agency knows will skew the allocation is certainly not "fair and equitable."
[7] "Bycatch" are those fish that are caught when a fisherman is pursuing a different species, but that are discarded, for whatever reason, and not sold for commercial gain.