State of NEW YORK, Erin M. Crotty, as Commissioner of the New York State Department of Environmental Conservation, and New York State Department of Environmental Conservation, Plaintiffs,

and

Rhode Island Department of Environmental Management, Intervening Plaintiff,

v.

Donald L. EVANS, in his official capacity as Secretary of Commerce of the United States, the United States Department of Commerce, Scott B. Gudes, in his official capacity as Undersecretary and Administrator for the National Oceanic and Atmospheric Administration, the National Oceanic and Atmospheric Administration, William T. Hogarth, in his official capacity as Director of the National Marine Fisheries Service, the National Marine Fisheries Service, and United States of America, Defendants.

No. 00–CV–3741–NGG.

United States District Court, E.D. New York.

Sept. 12, 2001.

*MEMORANDUM & ORDER*

GARAUFIS, District Judge.

Plaintiffs have brought suit seeking invalidation of U.S. Department of Commerce (the "Secretary") final regulations implementing federal quotas for the summer 2000 and 2001 scup fisheries.[1] Plaintiffs intend by this lawsuit to compel the Secretary to allocate a specific percentage of the overall summer scup quota to each state participating in the fishery. Plaintiffs now move for partial summary judgment on the grounds that the summer 2000 regulations are arbitrary and capricious. Because this court concludes that the Secretary's action is not arbitrary and capricious, the motion is denied and this claim is dismissed.

## I. Statutory Background

The Secretary regulates the Atlantic Coast scup fishery pursuant to the Magnuson–Stevens Fishery Conservation and Management Act (the "Magnuson–Stevens Act"), 16 U.S.C. §§ 1801 *et seq.* The Magnuson–Stevens Act establishes an Exclusive Economic Zone ("Federal Waters"), extending from 3 miles seaward off the coastline to 200 nautical miles offshore. *See id.* §§ 1802(11)(a). The United States (with exceptions not relevant here) exercises "exclusive fishery management authority" over fisheries within Federal

---

1. Scup (also known as porgy) is a schooling fish species found in the Northwest Atlantic Ocean primarily between Cape Cod, Massachusetts, and Cape Hatteras, North Carolina. "Fishery" is defined under the Magnuson–Stevens Act as "(A) one or more stocks of fish which can be treated as a unit for the purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational and economic characteristics; and (B) any fishing for such stocks." 16 U.S.C. § 1802.

Waters, *id.* § 1811(a), through Fishery Management Plans ("FMPs"), *see id.* § 1853. Regional Fishery Management Councils propose FMPs which are adopted by the National Marine Fisheries Service ("Fisheries Service"), in accordance with national standards and requirements under the Magnuson–Stevens Act. *See id.* §§ 1851–54. The Secretary promulgates regulations implementing these FMPs. *See id.* § 1854(b). The Secretary's regulations have the force of law within Federal Waters. *See id.* § 1856(a).

The Atlantic Coastal Fisheries Cooperative Management Act (the "Cooperative Act"), *id.* § 5101 et seq., permits Eastern Coastal states to participate in the management of Atlantic Ocean fisheries under a dual federal-state management regime. The Magnuson–Stevens Act expressly delegates exclusive regulatory authority within three miles of a state's coastline, traditionally recognized as state territorial waters ("State Waters"), to the individual states. *See* 16 U.S.C. §§ 1856(a)(1), (a)(2)(A). The Atlantic States Marine Fisheries Commission (the "States Commission"), which is comprised of representatives from the Eastern Coast states, prepares Coastal Fishery Management Plans ("CFMPs"). *See id.* § 5104. CFMPs do not require separate federal approval, but the states themselves are required under the Cooperative Act to implement and enforce CFMPs through state legislation. *Id.* §§ 5102(10); 5104(b). If a state fails to implement or otherwise comply with a CFMP, the Secretary, upon certain conditions, may intervene to impose a moratorium on fishing in the noncompliant state's State Waters. *See id.* § 5106.

## II. Factual Background

### 1. The Dual Regime

During the summer months, scup school primarily in State Waters and in Federal Waters during the winter months. (Admin.R. at 2.) In early 1995, the Fisheries Service concluded "that the scup stock is overexploited and at a low abundance level." (Admin.R. at 12.) In response, the Fisheries Service adopted a scup FMP (the "Federal Plan") proposed jointly by the Mid–Atlantic Fishery Management Council (the "Federal Council") and the States Commission, with input from the New England and South Atlantic Fishery Management Councils. The Federal Plan divided the fishing year into two winter periods and one summer period and set targets for fishing quotas to protect the fish stock. *See* 62 Fed.Reg. 5375, 43,420; 50 C.F.R. §§ 648.120(c), (d). The States Commission then adopted an identical plan as a scup CFMP (the "State Plan"). *See* 62 Fed.Reg. 5375.

On May 22, 1997 the Secretary published final regulations implementing a regulatory amendment (the "Regulatory Amendment") allocating state-by-state on a percentage basis the summer period's overall federal scup quota. *See* 62 Fed. Reg. 27,978. Under the Regulatory Amendment the Secretary would announce in the Federal Register each state's attainment of its scup quota; the state would then close its scup fishery, thereby prohibiting vessels licensed to fish under state permits from selling scup to fish dealers. Upon attainment of every state's quota, the Secretary would close the scup fishery in Federal Waters and forbid vessels licensed to fish under federal permits from selling scup to fish dealers. *See* 62 Fed. Reg. 5376. The States Commission adopted an addendum to the State Plan subdividing the overall summer quota into state-by-state allocations identical to the Regulatory Amendment. (*See* Admin.R. at 70–90.) Under this dual regime, any scup caught in either Federal or State

Waters were counted against both the Federal Plan quota and the State Plan quota of the state where the fish were sold to fish dealers. *See* 50 C.F.R. § 648.120(d)(4). Any fish sold in excess of a state's quota was recorded as an "overage." *See id.* While the Regulatory Amendment did not expand the Secretary's power to regulate in State Waters, a state's overages during one year's summer period would be subtracted by the Secretary from that state's Federal Plan quota for the next summer as a penalty. *See. id.*

### 2. Massachusetts Litigation

In June 1997, Massachusetts filed an action in federal district court to set aside the Secretary's Federal Plan to the extent that it established a state-by-state allocation of the summer quota. *See Com. of Mass. by Div. of Marine Fisheries v. Daley*, 10 F.Supp.2d 74 (D.Mass.1998). Massachusetts claimed that the state-by-state allocations were discriminatory. *See id.* at 75. The state argued that the data used to determine the allocations underestimated its appropriate share because scup caught and sold by small scale fishermen and dealers, who were not required to (and in fact did not) report amounts of scup caught and sold to the state or to the Fisheries Service, constituted 90% of the state's scup fishery. *See id.* at 76. The district court set aside the federal state-by-state allocations of the summer quota as discriminatory to Massachusetts local fisherman. *See id.* at 78.

In February 1999, the First Circuit affirmed the district court's decision on other grounds. *Mass. v. Daley*, 170 F.3d 23, 31–32 (1st Cir.1999). The court acknowledged that "if the state-by-state quotas were shown to be necessary to achieve the [Magnuson–Stevens Act's] main conservation goal, we would decide the case in favor of the Secretary." *Id.* at 30. None-

theless, the court held against the Secretary because the administrative record did not "explain why the state-by-state quota was necessary at all." *Id.* at 30. The court held that state-by-state allocation of the summer quota was not invalid per se, but required adequate justification in the administrative record.: "nothing in this opinion precludes the adoption—subject always to swift judicial review—of state-by-state quotas on an emergency basis, or through further proceedings in the ordinary course, or both." *Id.* at 32. Instead of remanding the case back to the Secretary, the court set aside the regulations to the extent they implemented Federal Plan state-by-state allocations but left intact the regulations implementing the Federal Plan's overall coastwide quota. *Id.*

Even before the district court decision, Massachusetts had ignored the Federal and State Plan dual regime. In January 1998, the Fisheries Service determined that Massachusetts' 1997 summer scup landings exceeded its 1997 Federal Plan allocation by over one million pounds. *See* 63 Fed.Reg. 3478–80. Subtracting Massachusetts' overages from the following year's allocation, the Fisheries Service determined that no commercial quota was available to Massachusetts for the 1998 summer period. *See* 63 Fed.Reg. 3480. Under the procedures envisioned by the Federal Plan, the Secretary would have closed the Massachusetts scup fishery for the 1998 summer period.

*Daley*, however, invalidated the Federal Plan state-by-state allocations of the summer quota effectively prohibiting calculation and enforcement of Massachusetts' overages. *See Daley*, 10 F.Supp.2d at 79. Thus constrained, the Secretary regulated the summer scup fishery in 1998 exclusively through enforcement of the overall coastwide summer quota. When this quota had been met, the Secretary closed

Federal Waters to further scup fishing. (*See* Admin.R. at 1341.) During the 1998 summer period, Massachusetts continued to ignore the Federal and State Plan conservation measures and landed almost 900,000 pounds of scup. (*See id.* at 1242.)

On November 5, 1998 the States Commission informed the Secretary that Massachusetts had not complied with the State Plan 1997 and 1998 state-by-state summer quotas. (*See id.* at 1192–1193.) Recognizing that *Daley* foreclosed enforcement of the Federal Plan state-by-state allocations, but believing that the corresponding State Plan quotas had been left undisturbed, the States Commission asked the Secretary, pursuant to the Cooperative Act, to enforce the summer quotas in the State Plan. (*See id.* at 1193; Supp.R. at 1490; Colvin Decl. ¶¶ 19, 20.) By letter dated May 4, 1999, the States Commission advised that Massachusetts' summer scup fishery should be closed to compensate for its 1997 and 1998 overages totaling 1,725,719 pounds. (Admin.R. at 1241–43.)

In June 1999 the States Commission forwarded to the Secretary a proposed emergency rule re-instituting state-by-state allocations to the Federal Plan for the 1999 summer scup fishery. (*Id.* at 1221–27, 1274–77, 1290–91.) Based on new data provided by Massachusetts, the States Commission's proposed rule increased Massachusetts' Federal Plan allocation of scup from 15% to 21.5883% of the 1999 summer quota to approximately 210,000 pounds. (*See id.* at 1276–77.)

On June 1, 1999 Massachusetts opposed the States Commission's request that the Secretary implement a moratorium on fishing in Massachusetts waters and denied that it had failed to comply with the State Plan. (*Id.* at 1268–73.) Massachusetts further opposed the States Commis-

sion's proposed rule and rejected its increased allocation as discriminatory under *Daley*. (*Id.*) By letters dated June 10, 1999 the Secretary informed the States Commission and the Federal Council that *Daley* prevented the Secretary from imposing a moratorium on fishing in Massachusetts waters and from enacting the proposed emergency rule re-establishing state-by-state allocations. (*Id.* at 1326–29.)

Instead of adopting the emergency rule, the Secretary set a Federal Plan coastwide quota for the summer of 1999 at 987,055 pounds. (*Id.* at 1073.) Massachusetts announced it would take up to 500,000 pounds of scup in the summer of 1999 notwithstanding the Federal and the State Plans. (*Id.* at 1272, 1305.) New York and Rhode Island, citing the lack of Federal Plan state-by-state allocations and Massachusetts' unwillingness to abide by the State Plan, also disregarded the Federal Plan quota and allowed fishing in their respective State Waters up to the limits set forth in the States Commission's emergency rule. (*See id.* at 1491.) As a result, the 1999 Federal Plan summer quota was exceeded by over 300,000 pounds. (*Id.* at 1073.)

On January 28, 2000 the Fisheries Service published proposed specifications, (*see id.* at 706; 65 Fed.Reg. 4550), setting the Federal Plan 2000 summer coastwide quota just under one million pounds, to be reduced to approximately 685,000 pounds by reason of the 1999 overages. (Admin.R. at 705–06.) On April 5, 2000 the States Commission issued another emergency rule which set a State Plan 2000 quota of approximately 1.3 million pounds for the summer, (Supp.R. at 1489–1502), with a decreased "discard rate," [2] and no

---

**2.** "Discards" are fish that are caught which, for regulatory or other reasons, are not land-ed and sold, but instead are discarded, usually dead. (*See* Admin.R. at 4–5, 563) A "discard

assessment for previous overages. (Admin.R. at 1371–74). The States Commission informed the Secretary that this emergency regulation was the result of an agreement by all states "achieved after a lot of hard bargaining." (*Id.* at 905–06.) The States Commission urged the Secretary not to implement the proposed Federal Plan 2000 coastwide quota, but rather to let the states "implement the emergency action as the only way to provide against a runaway summer fishery in 2000." (*Id.* at 906.)

The Secretary did not consent to the States Commission's request. On May 24, 2000 the Secretary published final regulations establishing the Federal Plan 2000 coastwide summer quota at 685,628 pounds. (Admin.R. at 1072–73; 65 Fed. Reg. 33,489–91.) Two months later, the Secretary closed the scup fishery to all federal permit holders because the Federal Plan 2000 summer quota had been exceeded. Nevertheless, the states permitted scup fishing in State Waters up to the limits of the quotas set forth in the States Plan 2000 emergency rule. As a result, the Federal Plan 2000 summer quota was exceeded by over 500,000 pounds. *See* 66 Fed.Reg. 12,904.

On June 23, 2000, New York filed this action, later joined by Rhode Island, seeking invalidation of the Federal Plan 2000 coastwide summer quota as arbitrary and capricious.

## III. Discussion

### 1. Standard of Review

■ The Secretary's promulgation of regulations implementing FMPs are reviewed under the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* *See* 16 U.S.C. § 1855(f)(1) (incorporating by reference 5 U.S.C. §§ 706(2)(A)–(D)). Under this standard, "[c]ourts must defer to the action taken by the agency, which is presumed to be valid." *Sierra Club v. U.S. Army Corps. of Eng'rs,* 772 F.2d 1043, 1051 (2d Cir.1985); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (stating courts have a duty to defer to "legitimate policy choices made by [the Secretary]"). Agency action is considered "arbitrary and capricious" if the agency: 1) relies on factors that Congress did not intend for it to consider; 2) entirely ignores important aspects of a problem; 3) explains its decision in terms contrary to evidence before it; or 4) reaches a decision that is so implausible that it cannot be ascribed to a difference in view. *See Motor Vehicle Mfrs. Assn. v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also, Sierra Club,* 772 F.2d at 1051. The Plaintiff bears the burden of demonstrating that the Secretary's action is arbitrary and capricious. *See Hanly v. Kleindienst,* 471 F.2d 823, 827–29 (2d Cir.1972); *see also, United Neighbors Civic Ass'n of Jamaica v. Pierce,* 563 F.Supp. 200, 205 (E.D.N.Y. 1983)

■ The question for a court is not whether it agrees with the decision of the Secretary, but whether the decision finds support in the administrative record. *See Natural Res. Def. Council, Inc. v. U.S. Nuclear Reg. Comm'n,* 582 F.2d 166, 172 (2d Cir.1978) ("What is required is that there be 'warrant in the record' and 'a reasonable basis in law' for the agency's determination. . . ."). This inquiry requires a narrow, careful and searching re-

---

rate" is a percentage reduction to a quota in order to take into account the diminution of the stock due to discards. (*See id.*) A lower discard rate translates to a smaller reduction of the quota allowing for more fish to be caught, landed and sold.

view of the administrative record. *Blassingame v. Sec. of the Navy*, 866 F.2d 556, 559 (2d Cir.1989). For a court to set aside the Secretary's decision as arbitrary and capricious, it must conclude that the administrative record is devoid of any justification for the action. *See Sierra Club*, 772 F.2d at 1051 (stating a court "will uphold a decision of less than ideal clarity if the path which [the agency] followed can be discerned."); *see also, J.H. Miles & Co. v. Brown*, 910 F.Supp. 1138, 1146 (E.D.Va. 1995) ("[T]he court must find that the administrative record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious.").

2. **The Secretary's Coastwide Quota Is Adequately Supported in the Administrative Record**

■ It is well documented that scup are overfished, (Admin.R. at 705), and the parties do not dispute that fact. Under the Magnuson–Stevens Act the Secretary must act to counteract the inimical effects of such overfishing. *See* 16 U.S.C. § 1854(e). The imposition of a coastwide quota is justified as a conservation measure which would allow for some fishing while rebuilding the fishery: "[t]he coastwide quota is a conservation measure, because it represents the maximum amount of fish that may be harvested while preventing overfishing and enabling this overfished resource to rebuild to its target level." (Admin.R. at 1280.) This rationale alone is sufficient to defeat Plaintiffs' motion. *See Sierra Club*, 772 F.2d at 1051;

*see also, J.H. Miles & Co.*, 910 F.Supp. at 1146. Plaintiffs cannot show that the Federal Plan 2000 coastwide summer quota is without justification in the administrative record. *Id.* Accordingly, this court must conclude that the regulation challenged here is not arbitrary and capricious.[3]

3. **The Challenges to the Secretary's Decision Lack Merit**

Even though the Federal Plan 2000 coastwide summer quota finds ample justification in the administrative record, Plaintiffs argue on several grounds that the Secretary's decision to promulgate a coastwide quota in lieu of state-by-state allocations is nonetheless arbitrary and capricious. These arguments—that the state-by-state allocations were necessary to prevent overfishing, that there was adequate support in the administrative record for the state-by-state allocations, and that the Secretary had the power to enact the state-by-state allocations but failed to do so—bring to stark relief the lack of cooperative restraint and the absence of effective central leadership which together may well doom this troubled fishery to a tragedy of the commons.[4] Nonetheless, this court is constrained to do no more here than determine whether or not the Secretary entirely ignored important aspects of the problem, explained its decision in terms contrary to the evidence before it, or relied on factors that Congress did not intend for it to consider. *See Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43, 103 S.Ct. 2856; *see also Sierra Club*, 772 F.2d at 1051. Plaintiffs have failed to show that the Sec-

---

**3.** In addition, it is noted that neither *Daley* decision found coastwide quotas to be arbitrary and capricious. *See Daley* 10 F.Supp.2d at 79; *Daley* 170 F.3d at 28.

**4.** *See* Garrett Hardin, *The Tragedy of the Commons*, 162 Science 1243 (1968). The tragedy ensues when "the rational but independent

pursuit by each decisionmaker of its own self-interest leads to results that leave all decisionmakers worse off than they would have been had they been able to agree collectively on a different set of policies." *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1378 n. 19 (D.C.Cir.1977).

retary's promulgation of the Federal Plan 2000 coastwide summer quota was deficient under any of these tests.

a. The Secretary's Decision Entirely Ignores Important Aspects of the Problem

According to Plaintiffs, the Secretary entirely ignored the fact that a coastwide quota encourages a "derby-style"[5] summer fishing season and overfishing contrary to the conservation rationale of the Magnuson–Stevens Act. As early as July 21, 1999 the Fisheries Service asserted the need for new state-by-state allocations. (Admin.R. at 1340.) The Secretary, through the Fisheries Service, explained the value of state-by-state allocations to the enforcement of the overall quota in the administrative record. (*Id.* at 1280, 1288.) Plaintiffs argue that the Fisheries Service's acknowledgment that state-by-state allocations are preferable to a coastwide quota renders the Secretary's failure to implement the former measures arbitrary and capricious. If the state-by-state allocations better conserve the fishery, Plaintiffs argue, any alternative is arbitrary and capricious as contrary to the Magnuson–Stevens Act's overarching conservation rationale.

This argument rests on the unfounded premise that state-by-state allocations are more effective than a coastwide quota. The first state-by-state allocations of the summer scup quota were ignored in 1997 and subsequently invalidated in 1998. In fact, there is no evidence in the administrative record that a state-by-state allocation of the summer scup quota has ever been effective. Furthermore, it is the states that have continued to allow fishing in State Waters after the Federal Plan's quota is reached and Federal Waters are closed; these states cannot now be heard to complain of a Federal Plan quota that does not guard against such overfishing, especially when the Secretary cannot enforce a Federal Plan quota in State Waters.

Moreover, even if Plaintiffs could show that federal state-by-state allocations are more effective, this fact alone would not warrant invalidation of the Secretary's action. *See Marsh v. Ore. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive."). Plaintiffs' alternative to the coastwide quota only serves to call into doubt the wisdom of the Secretary's decision. Where a challenge to an agency action "fairly conceptualized, really centers on the wisdom of the agency's policy, rather than on whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." *Chevron,* 467 U.S. at 866, 104 S.Ct. 2778. The Secretary's assessment of which fishery conservation and management measures are in the nation's best interest is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise," *Marsh,* 490 U.S. at 376, 109 S.Ct. 1851, not to be second guessed by Plaintiffs or this court, *Chevron,* 467 U.S. at 866, 104 S.Ct. 2778 ("[F]ederal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do."). While the Secretary's lack of initiative in

---

**5.** "Derby-style" fishing is "a race to fish" in which fisherman are encouraged due to limitations on a fishery to attempt to catch as much of a species as quickly as possible in order to maximize their harvest before a season or fishery is closed. *See, e.g.,* ASMFC Fisheries Focus, Vol. 9, Issue 2, Feb. 2000, at 4.

failing to re-establish state-by-state allocations may be lamentable, the Secretary did not ignore an aspect of the problem, and coastwide quota retains its presumption of validity based on the ample justification found in this administrative record.

b. The Secretary's Explanation Why State–By–State Allocations Were Not Justified Is Contrary to the Evidence

Plaintiffs next argue that the Secretary's decision to replace the state-by-state allocations, explained in terms of *Daley*, was contrary to the justification for the allocations based on the overfishing in the summer of 1999 in the administrative record. This is not the case. The First Circuit required that the justification for any federal state-by-state allocation "must demonstrate that the state-by-state quotas incorporate the best available scientific information and serve a conservation purpose. The administrative record must also show that if the new state-by-state quota system has some discriminatory effect among the states, any discrimination is necessary to conserve the scup resource." (Admin.R. at 1340.) The overfishing in the summer of 1999 alone does not provide justification for federal state-by-state allocations. As discussed above, the overfishing occurred in State Waters after the Federal Plan 2000 quota was reached and Federal Waters were closed to scup fishing. It is unclear that federal state-by-state allocations can effectively address this problem. Because the administrative record in May of 2000 did not clearly satisfy this standard, the Secretary's decision not to implement state-by-state quotas until the record could be supplemented was merely cautious, not erroneous.

Further, ample justification for the Secretary's decision to opt against state-by-state allocations once again appears in the administrative record. (*Id.* at 2403 (rejecting Federal Council and States Commission proposals due to inflated quota and decreased discard rate); 1412 ("[E]ven if it was determined that emergency action was warranted, the time frame for developing proposed measures made it impossible for [Fisheries Service] to take any sort of action by May 1[, 2000].")) Plaintiffs fail to show that the Secretary relied upon an erroneous interpretation of *Daley,* or that state-by-state allocations were justified in the administrative record. There is, therefore, no basis for concluding that the decision to implement a coastwide quota was explained in terms contrary to the evidence before the Secretary.

c. The Secretary Relied on Factors Congress Did Not Intend For It To Consider

Finally, Plaintiffs contend that the Secretary was prompted to reject state-by-state allocations and adopt a coastwide quota by an improper desire to avoid further litigation, and which is a factor Congress did not intend for the Secretary to consider. The administrative record clearly reflects that the Secretary took great pains to conform his actions to the *Daley* decisions. (Admin.R. at 1075, 1324–29, 1337–40.) There is no indication that apprehension of further litigation prompted agency action. In fact, the Secretary demonstrated a willingness to work toward future state-by-state allocations, (*id.* at 1075, 1324–29, 1337–40), despite the First Circuit's admonitions that they would be "subject to swift judicial review." *Daley,* 170 F.3d at 32. This court will not equate adherence to court mandates with an impermissible formulation of agency regulations based on an aversion to litigation.

Furthermore, the administrative record suggests that other permissible factors, rather than fear of litigation, motivated the

Secretary's decision. The Magnuson–Stevens Act itself, with its power-sharing ideal, is a particularly blunt tool with which to battle the tragedy of the commons. *See* William Funk, *Bargaining Toward the New Millennium: Regulatory Negotiation and the Subversion of the Public Interest,* 46 Duke L.J. 1351, 1374–75 (1997) (arguing that negotiated rulemaking betrays the public interest and debases agency authority). The lack of coordinated effort between the States Commission, Federal Council and the Secretary under this power-sharing regime is apparent throughout the administrative record. (*See, e.g.,* Admin.R. at 1403.) Examples of agendas contrary to the Magnuson–Stevens Act's conservation mandate, decision making based solely on expediency, and political wrangling permeate the minutes of Federal Council and States Commission meetings. (*See, e.g., id.* at 1091–96; 1198–1217.) Finally, logistical difficulties plague the amendment process and delay promulgation of regulations and emergency measures. (*Id.* at 1412.) The administrative record reflects that the existence of these factors, rather than fear of future litigation, counseled against adopting the States Commission's emergency rule and limited the Secretary's ability to formulate a solution involving state-by-state allocations. (*See, e.g., id.*) ("[The Fisheries Service] will have no option except to monitor the summer period coastwide quota . . .").

## IV. Conclusion

For the foregoing reasons Plaintiffs' motion for partial summary judgment is DENIED, and Plaintiffs' claim as to the summer 2000 scup regulations promulgated by the Secretary is DISMISSED. The parties are directed within 30 days to communicate to this court notice of the resolution of Plaintiffs' challenges to the summer 2001 scup regulations, or to make such motions as they deem appropriate.

**IT IS SO ORDERED.**